## WADDELL v. WADDELL et al.

No. 2008.    Decided September 22, 1909.    On Motion for Modification of Order November 8, 1909.    Rehearing Denied November 8, 1909 (104 Pac. 743).

1. TRUSTS—CONSTRUCTIVE TRUSTS—WRONGFUL ACQUISITION OF PROPERTY—EVIDENCE. Evidence *held* to show that a grantor wrongfully obtained possession of the deed and destroyed it to enable him to defraud the estate of the deceased grantee, so that the sum realized by the grantor on a resale of the property was a trust fund.    (Page 443.)

2. TRUSTS—FOLLOWING TRUST FUNDS—PRESUMPTION. Where a trustee mingles trust funds with his own and then draws out sums from the common fund, the law presumes that he draws out his own funds in preference to the trust funds.    (Page 447.)

3. TRUSTS—FOLLOWING TRUST FUNDS—RIGHT OF CESTUI QUE TRUST. Where a person receives money which equitably belongs to another and then converts it into another species of property, the beneficial owner is entitled to the proceeds whatever be their form provided only he can identify them, and, where they cannot be identified because the trust money has been mingled with that of the trustee, the beneficial owner is entitled to a charge on the new investment to the extent of the trust money traceable into it, and this rule applies to an express trustee or to any one occupying a fiduciary position.    (Page 452.)

4. TRUSTS—FOLLOWING TRUST FUNDS—IDENTIFICATION—BURDEN OF PROOF. While the burden is on the *cestui que trust* whose property has been misappropriated by the trustee to trace and identify his property, either in its original or substituted form, yet, when he has shown that property belonging to the trustee is represented in the property impressed with the trust, the burden is then on the trustee to show what his interest is, and, if he is unable to do so, the whole will be considered trust property. (Page 452.)

5. APPEAL AND ERROR—FINDINGS—CONCLUSIVENESS. The finding of the trial judge on conflicting evidence will not be disturbed on appeal, unless it clearly appears that there was error or mistake on his part. (Page 453.)

6. TRUSTS—FOLLOWING TRUST FUNDS—IDENTIFICATION—EVIDENCE. Evidence *held* to show that a trustee misappropriated trust funds, wrongfully used a part of the trust fund in purchasing personal property and a part thereof in paying for real estate, entitling the *cestui que trust* to a judgment for the amount of the misappropriation with a lien on the property acquired by the trustee. (Page 453.)

ON MOTION FOR MODIFICATION OF OPINION.

7. TRUSTS—ESTABLISHMENT OF TRUST—COSTS—LIABILITY. A voluntary grantee of real estate and a donee of personal property acquired by a trustee by misuse of trust funds is a trustee thereof, and the beneficiary compelled to sue him as well as the original trustee is entitled to have the costs taxed against him in connection with the original trustee. (Page 454.)

APPEAL from District Court, Third District; *Hon. C. W. Morse,* Judge.

Action by Leonora E. Waddell, as executrix of Isaac M. Waddell, deceased, against William M. Waddell and others.

From a judgment granting insufficient relief, plaintiff appealed.

REVERSED AND REMANDED.

*Stewart & Stewart,* and *E. A. Walton* for appellant.

*Moyle & Van Cott, Powers & Marioneaux,* and *N. V. Jones* for respondents.

## STATEMENT OF FACTS.

The facts in this case, briefly stated, are about as follows:

Isaac M. Waddell died testate in Salt Lake City, Utah, about December 13, 1902. Plaintiff is the second wife of the deceased, and, under the last will and testament, is the sole devisee of all his estate. The will was duly admitted to probate, and in due course of the administration of the estate all of the property of which Isaac M. Waddell died seised was distributed to the plaintiff under and by virtue of the provisions of the will. The defendant William M. Waddell is a son of the decedent by his first wife. Prior to the year 1899 William M. Waddell became the patentee of 160 acres of land situate in Fremont County, Idaho. About the year 1899 he sold, and by warranty deed conveyed said land to his father for the sum of fifteen hundred dollars, which was to be paid to William M. Waddell in installments at such times and in such amounts as he might require to defray his expenses while attending a dental school in one of the Eastern colleges. The deed to the land was never placed on record, but remained among the private papers of the grantee until about November or December, 1902, when William M. Waddell got possession of the document and destroyed it.

There was a certain city lot constituting the old homestead of the Waddell family situate about the center of the block between Third and Fourth South streets and First and Second West streets in Salt Lake City, Utah, which was a part of the property distributed to the plaintiff under the last will and testament of Isaac M. Waddell, deceased. On July 2, 1904, plaintiff conveyed to the defendant William M. Waddell a portion of the old homestead lot for the purpose of enabling him to build a home thereon. There is a conflict in the evidence respecting the terms and conditions upon which plaintiff made this conveyance. She testified that defendant William M. Waddell orally agreed that, if she would deed to him a part of the lot mentioned, he would deliver to her the deed which he had given to his father to the

Idaho property; that she consented to and did make the conveyance in order to avoid litigation over the Idaho property. She also testified that defendant William M. Waddell had surreptitiously and fraudulently taken the deed to the Idaho property from among his father's private papers subsequent to the latter's death, and that she would not have conveyed a part of the homestead lot to him if he had not promised to return to her the deed to the Idaho property; that she made a demand on him to reconvey to her the Idaho property, but that he refused to comply with her demand. On the other hand, defendant William M. Waddell testified that in the latter part of June, 1904, he offered to purchase from plaintiff a piece of the homestead lot; that she refused to sell, but, after some deliberation by her on the subject, she offered to give him a portion of the lot as a part of his share of the estate of his deceased father, and a few days thereafter made and executed a deed to him for a portion of the lot mentioned; that he took immediate possession of the tract of land thus conveyed to him and caused to be constructed thereon a substantial brick residence at a cost of between $2250 and $3000. On the 29th day of June, 1905, the defendant William M. Waddell intermarried with Florence Waddell, one of the defendants herein, and they took immediate possession of the house and ever since have continued to live therein. In December, 1905, William M. Waddell, without consideration, executed and delivered to his wife, Florence Waddell, a warranty deed to the house and lot mentioned. In the month of December, 1905, William M. Waddell sold and duly conveyed by warranty deed the Idaho property mentioned, and in consideration thereof received $2250. On May 15, 1907, plaintiff commenced this action as executrix of her husband's estate to recover judgment against William M. Waddell for the $2250 which he received for the Idaho land, with interest thereon, and for costs of suit. In her complaint she alleged, among other things, that—

"William M. Waddell willfully, wrongfully, fraudulently, in violation of his duty, and contrary to the interests of said estate of said Isaac M. Waddell and of the plaintiff, and with the intent and for the purpose of cheating and defrauding her. of the property to which she was entitled by the said last will and testament of the said Isaac M. Waddell, . . . and without right or authority so to do, sold and transferred the said property situate in Fremont county, Idaho; . . . that the money so realized from the sale of said Idaho property has been expended by the said defendant William M. Waddell in the erection and construction of the said dwelling house heretofore referred to, . . . and in the furnishing of the same."

It is further alleged that "the said defendant William M. Waddell has invested a part of said funds in the purchase of certain pure bred collie dogs." It is admitted that defendant Waddell purchased one of these dogs (Belfield Bangle) in April, 1906, and paid therefor $270; that he gave this dog to Florence Waddell, his wife, one of the defendants herein; and that he purchased the other dog in January, 1907, paying therefor the sum of $500. Both of these dogs were owned by and in the possession of the Waddells at the time this action was heard in the district court. In the prayer of her complaint plaintiff asked that she be given judgment for $2250, with interest thereon, and that the judgment be declared a lien upon the land—a portion of the old homestead—which she conveyed to William M. Waddell and the improvements thereon, and on certain personal property hereinafter mentioned. Defendant William M. Waddell answered and denied the allegations contained in the complaint upon which plaintiff relied for a recovery.

A trial was had, and the court rendered judgment in favor of plaintiff and against William M. Waddell for the sum of $2250 and interest thereon at the rate of eight per cent. per annum, amounting in all to $2580, and for costs of suit, but found against plaintiff on all the issues presented by the allegations of fraud contained in her complaint. The court further found:

"That said deed [referring to the deed from William M. Waddell to Isaac M. Waddell to the Idaho land] did not come into the possession of the said Wiliam M. Waddell fraudulently and the same was not by him fraudulently destroyed, but was by him destroyed in good faith and because he believed he had the right to destroy it."

The court also found:

"That no part of said $2250 realized by the said William M. Waddell from the sale of said Idaho property has been expended by him in the erection and construction of the dwelling house, or any of the improvements made by him upon the city lot, . . . and no part of said sum of money was used or has been used by said defendant William M. Waddell for furnishing said house; . . . that none of the property mentioned in plaintiff's complaint was purchased with money realized from the sale of said Idaho land."

From that part of the decision which is adverse to plaintiff she has appealed to this court.

McCARTY, J. (after stating the facts as above).

We think the finding of the court that William M. Waddell came rightfully into the possession of the deed to the Idaho land, and that he destroyed the same, believing that he had a right to do so, is against the weight of the evidence, and therefore erroneous. The facts and circumstances leading up to and surrounding the destruction of the deed, when considered in connection with the testimony of plaintiff, tends to show that respondent William M. Waddell must have known that he had no right to destroy the deed. Plaintiff testified that, soon after the death of Isaac M. Waddell, she saw the deed at her home, and heard it read in connection with the last will and testament of the decedent; that, after the documents were read, the deed was put into a desk with other private papers of Isaac M. Waddell; that she afterwards searched for the deed, but could not find it. Respondent William M. Waddell testified that he obtained possession of the deed in the presence of his father about two weeks before his father's death; that on the same day he got possession of the deed he took it to his private office

in the Templeton Building, this city, and there destroyed it; that he destroyed it because he thought it belonged to him. Why he did not destroy the deed at his father's residence when he first got possession of it does not appear. The fact that he took it to his office in the Templeton Building before destroying it is at least a circumstance tending to show bad faith on his part. He knew that he had sold the property covered by the deed to is father for value, and that his father had taken possession of it. Furthermore, his father in his will bequeathed all his property, including the land in question, to plaintiff, which shows conclusively that he did not intend to give it to respondent William M. Waddell.

It is contended on behalf of respondent that the testimony of plaintiff wherein she says that the deed to the Idaho land was among the private papers of her husband after his death is discredited, and ought not to be believed, because she never discussed the matter of the missing deed with William M. Waddell until one year and six months after she discovered that it was lost or had been taken away, and that one year and seven months after her husband's death she "deeded to the defendant William M. Waddell a portion of the old homestead lot which had been distributed to her." The evidence shows that respondent William M. Waddell lived with plaintiff—was one of the family—from the time he was thirteen until he was nineteen years of age. When he returned from college, he again made his home with plaintiff and her husband, and was living with them at the time of his father's death. The record also shows that plaintiff was very much attached to William M. Waddell, and had great confidence in him. When he went into business for himself, she mortgaged property and enabled him to borrow one thousand dollars with which to purchase furniture and fixtures for his office. This debt she was compelled to pay. She gave him the land upon which he built his residence. His testimony wherein he states that plaintiff let him have this piece of ground as a part of his share of his father's estate is entitled to but little, if any, weight. At the time this conveyance was made, William M. Waddell had been advised of the terms of

his father's will, and knew that he had no interest whatever in the estate. Therefore the contention that plaintiff gave him this land as a part of his interest therein is wholly untenable. On July 17, 1904, two weeks after plaintiff conveyed to respondent Waddell a part of the homestead lot mentioned, she wrote him a letter, which was introduced in evidence by respondent. In that letter she addressed him as "My Dear Boy," and used other endearing terms, showing that as a man he stood high in her estimation. On cross-examination she testified in part as follows: "I have always trusted him. . . . I had taken and befriended him as a mother, and I never looked forward to him doing any such dishonorable act. Q. You never thought he was dishonorable, did you? A. I never thought he was; never thought of such a thing. I didn't want to think any such a thing. . . . Q. You thought he was an honorable man, didn't you? A. I did." And she no doubt believed, as she says further along in her testimony, that "he would make things right," and that she would eventually recover her land without litigation. On the other hand, the whole course of conduct of respondent Waddell towards plaintiff from the time he borrowed the one thousand dollars with which to furnish his office, which he has never repaid, until the trial of this case, has been one of bad faith on his part. Therefore these delays, under the circumstances, ought not to discredit the testimony of plaintiff, but the advantages taken of them by respondent Waddell to defraud her of her property and to dissipate and squander it in such a way as to render it impossible for her to recover but a small portion thereof, and that, too, during a period when, according to his own testimony, he made two thousand dollars on real esate deals and was earning from two hundred and fifty to seven hundred dollars per month in his profession as a dentist, tends to weaken the effect of his testimony rather than that of the plaintiff. We remark, in concluding the discussion of this branch of the case, that the record does not disclose a fact or circumstance that would justify a belief on the part of the respondent Waddell that he owned the Idaho land, or

that he had a right to destroy the deed in question; but, on the contrary, the only reasonable deductions that can be drawn from the evidence as a whole on this point are: (1) That he came into possession of the deed wrongfully, and tore it up for the purpose of destroying evidence of title and thereby enable him to defraud the estate; and (2) that he fraudulently misappropriated the money to his own use which he received for the land covered by the deed.

Counsel for respondent Waddell admit that the $2250 realized by him from the sale of the Idaho land constituted a trust fund of which appellant, plaintiff, was the sole beneficiary. Appellant contends that at least some of this fund was expended by respondent in making improvements on that part of the old homestead lot which she deeded to him, and that he took a portion of the trust fund and paid at least sixteen monthly installments of $22.80 each as they became due on the loan of $2250 which he obtained from the Union Savings & Investment Company with which to pay for the construction of the dwelling house mentioned, and that she is therefore entitled to a lien on the dwelling house and the land upon which it was erected, also on the two dogs hereinbefore mentioned for that portion of the trust fund so expended, and that the findings of the court on the issues involving these questions are erroneous. As we have observed, the land upon which the dwelling house and the improvements mentioned were constructed was conveyed by appellant to respondent William M. Waddell July 2, 1904, and the loan of $2250 from the Union Savings & Investment Company with which to pay for the construction of the house was obtained October 7, 1904, and the evidence without conflict shows that the house was practically completed by June, 1905, several months prior to the sale of the Idaho property. Therefore, unless it is made to appear that the payment of one or more of the installments of $22.80 on the loan obtained by Waddell to build the house were made out of the trust fund, the findings of the court on this point will have to stand. The first payment ($750) on the Idaho land was

received by respondent Waddell December 29, 1905, and by him deposited to the credit of his personal current account which he had with one of the banks in this city. We will first determine whether plaintiff's contention respecting the disposition made by Waddell of the $750 is supported by the record, and we will then consider whether her contention respecting the use he made of the balance of the purchase price of the Idaho land is well founded. About the time Waddell deposited this $750 he deposited $1067.50 of his own money. He testified that he also received from $300 to $400 each month during the years 1906 and 1907 from his professional services; that one month he earned over $700; that he would carry his money around in his pocket as he received it for two or there weeks, and then deposit all except what he had paid out for expenses and other purposes. His memory respecting these alleged earnings and the disposition he made of them appeared to be vague and uncertain, and his testimony on this point was evasive and very unsatisfactory. The following is a sample of his testimony respecting his income from his profession: "Q. I will ask you what your business amounted to per month, or per year, during 1905 ? A. I haven't any idea. Q. Can you approximate it ? A. No, sir; I could not. Q. Did it amount to any more than your ordinary living expenses and office expenses ? A. I could not tell you that. Q. Now, take the year 1905, are you able to state whether you think that you had a surplus during that year out of your business above your expenses, or a deficit ? A. I had a surplus if anything. Q. Was that any considerable amount ? A. Yes, Q. Well, about how much ? A. Oh, about several hundred dollars. . . . Q. Mr. Waddell, during the year 1906, did you, out of your business, make a surplus over your living expenses, or was there a deficit ? A. I think it was over. Q. Can you approximate the amount it was over ? A. I cannot say the amount." On being further pressed to give an estimate the witness answered: "Oh, I should say five hundred dollars or six hundred dollars anyway. Q. And the year 1907 ? A. About the same

amount, I think. Q. And this year up to the present time (July 1, 1908) has your income exceeded your expenditures? A. No. This year I figure I spent just as we got it and it has taken about all that I made to do it." On cross-examination he was asked what his income was from his profession per month for the year 1907, and he answered: "Well, I cannot say exactly. I think I would be safe in saying two hundred and fifty dollars." And he further stated: "I think probably some months along about that time my net profits would be more than that." It will be noticed that, according to Waddell's testimony his income from his profession prior and up to the very day he received the first payment on the Idaho land was but little more than sufficient to pay his current expenses; that immediately upon the receipt by him of the seven hundred and fifty dollars trust fund his income from his profession increased, and the general average of his receipts from this source exceeded four thousand dollars per year for 1906 and 1907; that, when he spent the last dollar of the trust fund in the latter part of the year 1907, his income, without any apparent reason therefor, decreased to a point where it was barely sufficient to pay his running expenses. No claim is made that his expenditures were any more per month during the year 1908 than they were in 1906 and 1907. Rather, the inference would be that, if there were any changes, they were less, because the record shows that since the trust fund was exhausted (October 18, 1907) his wife has been earning money and paying the installments on the mortgage to the Union Savings & Investment Company, and Waddell was thereby relieved of this item of expense. These circumstances are significant as bearing upon the weight to be given his testimony, especially in view of the fact that he did not attempt to explain or account for these sudden, for him opportune, changes in his business. How much of these alleged earnings were deposited in the bank during the year 1906 he does not pretend to say. For aught that appears in the record, the aggregate of these deposits, if any such were made, may have been but a small amount.

At any rate, the question as to whether the sum total was sufficient to materially affect the result of this case is purely a matter of speculation and conjecture. and therefore cannot be considered. On January 3, 1906, respondent Waddell and his wife started on a tour through the Eastern and Southern states, and drew from this mixed fund $1500 to pay the expenses of the trip. In the meantime he issued several small checks against the fund, which, together with the $1500 referred to, reduced the fund on deposit in the bank to about $300. When he returned from his trip he deposited (February 9, 1906) $325 that he had left of the $1500 which he drew from the fund to defray the expenses of the journey. This deposit, together with sixteen dollars which was deposited in the bank while he was absent on his trip, increased the fund to about $641. The record shows that on January 9, 1906, when there was only $300 of the fund left on deposit in the bank, he drew from it $6.37 to pay for lumber that was used in making permanent improvements on that part of the old homestead deeded to him by plaintiff. On February 26, 1906, he drew $22.80 from the fund, and paid an installment on the mortgage to the Union Savings & Investment Company. And it is admitted that in the latter part of each month from and including March, 1906, to and including September, 1907 (April, 1906, and February, May, and June, 1907, excepted), respondent Waddell issued a check for $22.80 against the funds he had on deposit in the bank. While he claimed in his testimony that he did not remember whether the several checks, each of which was $22.80 (none of which were produced at the trial), were drawn to pay the monthly installments on the mortgage to the Union Savings & Investment Company or for other purposes, yet we think the only reasonable conclusion that can be drawn from the evidence on this point is that these checks represented payments made on the mortgage. On April 9, 1906, he paid $270 for the dog, Belfield Bangle, hereinbefore mentioned. While he testified that he did not know whether he paid for this dog with money drawn from the fund that he had on deposit in the bank

or with "side money" which he carried around in his pocket, we think the only reasonable deduction that can be made from the evidence on this point is that the dog was paid for with a check drawn by Waddell against this fund. About the time he purchased the dog he issued a check for $270 (the purchase price of the dog), which was paid by the bank out of the fund. He did not claim that this check was issued for any other purpose, but that it "might have been" drawn to pay for the dog. On July 14, 1906, he used $3.30 of this fund to pay for lumber that was used in his residence. On July 23, 1906, he drew twenty dollars from the fund, and made a payment on a piano which he had previously purchased on the installment plan. On September 24, 1906, he again drew twenty dollars out of the fund to make a payment on the piano, and on December 17, 1906, he made another payment of twenty dollars on the piano out of the fund. The rule, as declared by the weight of authority, seems to be that when a trustee mingles trust money with his own, and then draws out sums from the common fund by checks or otherwise, it will be presumed that he drew out his own in preference to the trust money. In the case of *Burnham v. Barth,* 89 Wis. 362, 62 N. W. 96, the general rule is tersely, and, as we think, correctly stated as follows: "When a trustee mingles trust money with his own in a bag, or box, or bank account, the right of the beneficiary attaches to have all that belongs to him out of the bag, box, or account, and whatever the trustee may take out will be deemed to have been taken from his own instead of the trust funds." (*Importers' & T. N. Bank, v. Peters et al.,* 123 N. Y. 272, 25 N. E. 319; *State v. Bank of Commerce,* 54 Neb. 725, 75 N. W. 28; *City of Lincoln v. Morrison,* 64 Neb. 822, 90 N. W. 905, 57 L. R. A. 885; *In re Northrup* [D. C.], 152 Fed. 763; *Ellicott v. Kuhl,* 60 N. J. Eq. 333, 46 Atl. 945; *Little v. Chadwick,* 151 Mass. 109, 23 N. E. 1005, 7 L. R. A. 570; *In re Mulligan* [D. C.], 116 Fed. 715.) We also invite attention to an elaborate discussion of the rights of a *cestui que trust* whose property had been mingled with that of a trustee

which will be found in the note to *Lowe v. Jones,* 192 Mass.
94, 78 N. E. 402, 6 L. R. A. (N. S.) 487, 116 Am. St. Rep.
225, 7 Am. & Eng. Ann. Cas. 553, in which many decisions,
both state and Federal, and the leading English cases, are
reviewed.

Applying the foregoing rule to the facts in this case so far
as we have reviewed them, it follows that when Waddell
on January 3, 1906, drew $1500 out of the fund with which
to pay the expenses of his trip east, $1067.50 of this sum
was his own money and $432.50 was money which he held in
trust for plaintiff. And it will also be presumed that Wad-
dell in defraying the expenses of himself and wife on their
trip through the Eastern and Southern states paid out his
own money first before he spent any of the trust fund, and
that the $325 which he had left of the $1500 when he re-
turned home belonged to and was a part of this fund. This
being so, the only money Waddell had on deposit in the bank
after he returned from his Eastern trip (February 9, 1906)
until December 29, 1906, were trust funds. We therefore
have $544.87 of the trust fund $750 invested in property
now in the possession of the defendants Waddell and his
wife. In concluding the discussion of this part of the case,
it might be well to remark that Waddell produced at the
trial his check books and stubs for 1902, 1903, and 1904,
but was unable, so he claimed, to produce his bank book,
or any of his check books or stubs for 1905, 1906, or 1907.
He was examined at considerable length respecting the pur-
pose for which certain checks were issued against his bank
account. Checks upon which he was examined that in
no way related to any of the transactions connected with the
property involved in this suit he remembered very distinctly.
Transactions of this character which occurred in the regular
course of business and involved but a few dollars, and to
which he attached no special importance, he was able to, and
did when questioned thereon, explain every detail relating
to or growing out of the particular transaction; whereas,
respecting other and subsequent transactions which involved
hundreds of dollars of the trust fund, he would in some in-

stances first claim that he knew nothing about the transaction, and then later on in his testimony admit that possibly some such transaction took place. When questioned as to whether or not he deposited the money he received for the Idaho land, he at first insisted that he did not remember whether he put it in the bank or carried it around in his pocket, but finally admitted that he deposited it in the bank at or about the time he received it. We have read the entire transcript, and are forced to the conclusion that William M. Waddell's testimony is not entitled to any weight whatever except as it is corroborated by other evidence.

In the latter part of the year 1906 (November or December) respondent William M. Waddell received the last payment ($1500) on the Idaho land and deposited the money in the bank. He testified that he also deposited $1000 of his own money on or about the day he deposited the $1500. He had but one bank account. On this point he testified in part as follows: "All the money I got was mixed. Did not have separate bank accounts for it. . . . Ever since I received the $2250 (referring to the trust fund) I have kept all my money either in my pocket or in my bank account, and have paid out whether on account of the dogs or for other things money from the bank account by check or out of my pocket indifferently, and have never had any special fund for land or business, or dogs, or anything." In January, 1907, Waddell paid five hundred dollars for a dog called Southport Silver. On January 19, 1907, he made a payment of ten dollars on his piano out of this fund. On December 3, 1906, and in the latter part of each succeeding month thereafter (February, May, and June excepted) to and including September 28, 1907, Waddell drew a check for $22.80 against this fund. As hereinbefore stated, none of these checks were produced at the trial notwithstanding plaintiff in open court requested Waddell to produce them. The evidence, however, as we have observed, is all but conclusive that these checks represented installments paid on the mortgage given by Waddell to the Union Savings & Invest-

36 Utah—29

ment Company for the $2250 that he borrowed and expended in the construction of his house. It is strenuously insisted by counsel for respondents that there is no evidence in the record which shows, or tends to show, that any of these payments or investments were made with trust funds. True, Waddell in his testimony repeatedly asserted that he did not know where he obtained the money; but counsel in their printed brief in effect concede that the money with which these payments were made came out of the mixed fund which he had on deposit in the bank. It is apparent that the occasional lapse of memory and the evasions on the part of Waddell while testifying were due to a determination on his part to avoid making any statement or admitting anything that would tend to explain what disposition he made of the trust fund. As we have heretofore stated, he was able to and did remember very distinctly transactions of but little importance which took place one, and, some of them, more than two years before those we now have under consideration, but which in no way connected the trust fund with the property involved in this action. Therefore there is no reason why he should be unable, at least to some extent, to remember the more recent and important transactions, some of which involved hundreds of dollars. Furthermore, nowhere in his testimony does he say that when he drew from the fund five hundred dollars to pay for the dog Southport Silver, he left fifteen hundred dollars, the amount of the trust fund on deposit. When interrogated with respect to this matter, he either claimed he did not know where he got the money or evaded the question. The following are samples of his testimony elicited by his counsel on this point: "Q. You had enough, you mean to say, when you bought the dog for five hundred dollars, you had so much money or had it that in drawing the check on it, for example, you could not tell whether it necessitated the taking of any particular money or not? A. No, sir. I don't know whether I drew a check for that or whether I had the money." Again he says: "Well, that five hundred dollars, I don't know whether it was from some of

this money I got from the Idaho property or whether I got it from my business. Q. You don't know where you got it? A. No, sir. . . . Q. Here is one (a check) dated January 19, 1907, to John Chamberlain for ten dollars. Do you know how much money you had in the bank at that time? A. No, sir." The record shows that on October 18, 1907, Waddell drew out $204, all the money he had on deposit, and closed his account with the bank. It will therefore be seen that Waddell checked out this mixed fund between about December, 1906, and October 18, 1907. At what time it was reduced to fifteen hundred dollars, the amount of the trust fund, he does not pretend to say. His bank books, his check books containing the stubs, and his canceled checks for 1906 and 1907, with the exception of a few small checks, he claimed were lost and could not be found; but those bearing date of 1902, 1903, and 1904, he had no difficulty in producing. This circumstance, considered in connection with his other evidence, tends to show bad faith on his part. Counsel in their brief insist that, when the payments last referred to were made, the funds left in the bank exceeded the amount of the trust money; but Waddell nowhere in his testimony ventures a statement to that effect. True, he claimed that he had money of his own in the bank when the payments were made, but he does not say whether it was much or little, or whether the sum total of all the money to his credit exceeded fifteen hundred dollars. If, as a matter of fact, none of these payments were made with trust money, it is reasonable to believe that Waddell would have said so. The record shows that in certain supplemental proceedings in which he was the defendant growing out of transactions with the plaintiff he was examined under oath respecting the disposition he made of this trust fund, and was there asked: "Did you put any of the money (trust fund) in this house that you now live in?" He answered, "Yes." In reply to the question, "How much?" he said, "I could not say." After a careful review of all the evidence, we are forced to the conclusion that the payments under consideration were at

least in part made with trust funds. Plaintiff is therefore, under well-settled principles of equity, entitled to a lien on each specific piece of property to the extent of the trust fund traceable into it.

The equitable doctrine applicable to cases of this character, where a person receives money which equitably belongs to another and converts it into another species of property, is well illustrated by Sir George Jessel, **3** Master of the Rolls, in the following language (quoted with approval in *National Bank v. Insurance Co.*, 104 U. S. 68, 26 L. Ed. 693):

"The doctrine of equity, as regards property disposed of by persons in a fiduciary position, is that, whether the disposition of it be rightful or wrongful, the beneficial owner is entitled to the proceeds, whatever be their form, provided only he can identify them. If they cannot be identified, by reason of the trust money being mingled with that of the trustee, then the *cestui que trust* is entitled to a charge upon the new investment to the extent of the trust money traceable into it; that there is no distinction between an express trustee and an agent, or bailee, or collector of rents, or anybody else in a fiduciary position; and that there is no difference between investments in the purchase of lands, or chattels, or bonds, or loans, or moneys deposited in a bank account."

The following cases illustrate and declare the same doctrine: *Lowe v. Jones, supra; In re Marsh et al.* (D. C.), 116 Fed. 396; *Southern Pine Co., etc., v. Trust Co.*, 141 Fed. 802, 73 C. C. A. 60; *Smith v. Township of Au Gres*, 150 Fed. 257, 80 C. C. A. 145, 9 L. R. A. (N. S.) 876; *In re Mulligan* (D. C.), 116 Fed. 715.

It is also a well-established rule of law that, while the burden is on the party whose property has been misappropriated by a trustee to trace and identify his property either in its original or substituted form, yet, **4** when he has succeeded in doing this, if it is shown that property belonging to the trustee is represented in the property impressed with the trust, then the burden is cast upon the trustee to show what his interest is, and, if he is unable to do so, the whole will be considered trust property.

(28 Am. and Eng. Ency. Law, 1120, and cases cited.) Plaintiff, having shown that at least some of the trust fund was used in making each of the payments above mentioned, the burden was upon Waddell, if any of his own money was used in connection with the trust fund in making these payments, to show how much; and, having failed to do so, each payment will be deemed, as between these parties, to have been made with trust funds only.

It is with reluctance that we have come to the conclusions herein announced, for we fully recognize the well-established rule to be—and we have no inclination whatever to depart from it in this case—that the findings of a trial judge upon conflicting testimony, who sees and hears the witnesses testify, should not be disturbed, unless it clearly appears there was error or mistake on his part. But the whole course of conduct of respondent William M. Waddell from the time he obtained possession of the deed to the Idaho land and fraudulently destroyed it to the time he spent the last dollar of the trust fund shows such bad faith on his part, and his testimony respecting the disposition he made of the fund so unreliable, that we are impelled to make the foregoing observations in reference thereto, and are forced to the conclusion that the trial judge committed error.

The cause is remanded, with directions to the trial court to set aside the findings of fact and the judgment rendered thereon, and to make findings in accordance with the views herein expressed, and enter judgment in favor of plaintiff for the $2250 trust fund, and interest thereon, and that the judgment be declared a lien on the house and lot for $351.67, on the piano for $70, on the dog Belfield Bangle for $270, and on the dog Southport Silver for $500, interest to be computed on the several amounts from the time they were taken from the trust fund and invested in the property mentioned. Costs to be taxed against respondent William M. Waddell.

STRAUP, C. J., and FRICK, J., concur.

ON MOTION FOR MODIFICATION OF ORDER DIRECTING THAT
JUDGMENT BE ENTERED IN FAVOR OF APPELLANT.

PER CURIAM. Appellant has filed a motion in which she asks for a modification of the order in the foregoing opinion, which directs that judgment be entered in her favor in accordance with the views therein expressed, and that she be awarded her costs against respondent William M. Waddell. The contention made by appellant is that respondent, Florence Waddell, being voluntary grantee of the real property and a donee of much of the personal property involved, is herself a trustee; and, having resisted appellant's claims in this as well as in the trial court, appellant is entitled to have the costs taxed against her in connection with her co-respondent William M. Waddell.

Upon further consideration of the case we have come to the conclusion that the motion is well taken, and that appellant should be awarded costs against respondents William M. Waddell and Florence Waddell. It is so ordered.