## BOROUGHS v. PETERSON et al.

No. 2153. Decided March 17, 1911 (114 Pac. 758).

1. APPEAL AND ERROR—REVIEW—VERDICTS—CONCLUSIVENESS. Where the evidence is conflicting, the appellate court will assume that the testimony for the party obtaining judgment is true. (Page 16.)

2. MONEY RECEIVED—GROUNDS OF ACTION. To sustain an action for money had and received, a plaintiff must show that there has been an actual receipt of the money or something equivalent to it by the defendant, and the evidence must tend to show a definite sum or sufficient facts from which by calculation a jury may ascertain the sum. (Page 17.)

3. GAMING—RECOVERY BY LOSER—EVIDENCE—SUFFICIENCY. In an action for money had and received to recover money alleged to have been lost in defendant's gambling house, evidence *held* insufficient to sustain a verdict for plaintiff for five hundred dollars rendered, but sufficient to sustain a modified verdict for one hundred and sixty dollars. (Page 20.)

4. APPEAL AND ERROR—DISPOSITION OF COSTS—AFFIRMANCE—AFFIRMANCE ON REMISSION OF PART OF RECOVERY. Where plaintiff recovers at law a judgment to an amount which is not sustained by the evidence, and where it is practically certain that the defendants have no defense to the amount of recovery, as modified, the judgment will be affirmed upon plaintiff's remission of the excess of the judgment as modified.[1] (Page 22.)

STRAUP, J., dissenting.

---

[1] Foulger v. McGrath, 34 Utah, 86, 95 Pac. 1004.

APPEAL from District Court, Second District; *Hon. J. A. Howell*, Judge.

Action by Maud Boroughs against Frank Peterson and another.

Judgment for plaintiff.    Defendant appeals.

AFFIRMED, on condition that plaintiff remit part of the recovery, otherwise judgment reversed.

*E. T. Hulaniski* for appellants.

*J. D. Skeen* for respondent.

### APPELLANTS' POINTS.

A jury should not be permitted to determine a case upon its own opinion as to the justice between the parties, without even attempting to follow the evidence or the instructions of the court.    (2 Thompson on Trials, sec. 2606, page 1971, and cases cited; *Brewery Co. v. Bodeman,* 12 Mo. App. 573; *Ellsworth v. Railroad Co.,* 34 N. J. Law 93; *Biggs v. Barry,* 2 Curt. C. C. [U. S.] 259.)

Whether or not there is any evidence to support a verdict, is a question of law within the meaning of section 9, article 8, Constitution.    (*Marti v. Smelting Co.,* 23 Utah 52.)

Where there is no substantial evidence to support a verdict, the question becomes one of law and it becomes the duty of the Supreme Court to set aside the judgment.    (*San Pedro R. Co. v. Board of Education,* 32 Utah 305.)

The verdict of the jury is deemed excepted to Section 3283, Compiled Laws Utah, 1907.    There being no evidence in support of such issues submitted to the jury, the court erred in refusing to take the case from the jury and again erred in refusing the defendant's motion for a new trial.    (*Tyng v. Constant Loraine Inv. Co.,* 37 Utah 304, 108 Pac. 1112.    See, also, *State v. Brown,* 36 Utah 46, 102 Pac. 641, 24 L. R. A. [N. S.] 545.)

But the silence of the party, even where the declarations are addressed to himself, is worth very little as evidence where he has no means of knowing the truth or falsehood of the statements. (1 Greenleaf Ev., sec. 199, page 276.)

There is hardly any ground to infer acquiescence in such cases, unless it appears that the truth or falsehood of the statement made must have been within the knowledge of the party sought to be charged. (1 Jones Ev., sec. 291, page 652.)

If the occasion or the nature of this demand or the manner of making it will reasonably justify silence in a discreet and prudent man, no unfavorable inference therefrom should on that account be made against the party, and whether the silence be any ground of presumption against the party will always be a question of law, unless there is conflict in the proof of the attending circumstances. (*Mattocks v. Lyman,* 16 Vt. 113; *Vail v. Strong,* 10 Vt. 457; *Gale v. Lincoln,* 11 Vt. 152; 1 Greenleaf on Ev., sec. 198, page 274, note.

Verbal admissions should be received with great caution, (1 Greenleaf on Ev., sec. 200.)

Admissions as to right or title which therefore are in part admissions of matter of law and consequently are in reality but opinions, are certainly entitled to little or no weight. (*Colt v. Selden,* 5 Watts 525.)

Therefore it has been declared that declarations of parties are the most unsatisfactory species of evidence, because of the facility with which it may be fabricated and the impossibility of contradicting it, and because the slightest mistake or failure of recollection may totally alter the effect of the declaration. (*Botsford v. Burr,* 2 Johns. Chan. 405-412; *Vaughn and McKees' Heirs v. Hann,* 6 B. Mon. 338; *Robertson v. Robertson,* 9 Watts. 32; Smith's leading cases, 6 Am. Ed., vol. 2, 452.)

An offer to compromise should not be regarded as an admission of indebtedness. (*Myer v. Goggerty* [Kan.], 63 Pac. 296.

The prevailing rule in England and in this country is that the offer to compromise will be presumed to have been

made without prejudice, if it was plainly an offer to compromise. (Jones Ev., sec. 293; *West v. Smith,* 101 U. S. 263; *Home Ins. Co. v. Baltimore Warehouse Co.,* 93 U. S. 527; *Richards v. Noyes,* 44 Wis. 609; See, also, *Mattocks v. Lyman,* 16 Vt. 113-118, 1 Enc. Ev. 378.)

FRICK, C. J.

Respondent brought this action against the appellants to recover the sum of two thousand dollars as for money had and received by them for her use and benefit. The material allegations in the complaint, in substance, are: That the appellants were conducting a gambling house in Ogden City, Utah; that respondent on the 15th day of April, 1909, was the owner of two thousand dollars in cash; that between the date aforesaid and the 13th day of May, 1909, respondent's husband took said money from her possession without her consent, and, contrary to her directions or instructions, he lost the same by gambling in the gambling house of appellants, and that they by that means and in that manner obtained and received said two thousand dollars "for the use and benefit of the plaintiff herein;" that before bringing the action respondent demanded said money from appellants, which they refused to return to her. The answer, in legal effect, amounts to a general denial. A trial to a jury resulted in a verdict and judgment in favor of respondent for the sum of five hundred dollars. The appellants present the record to this court on appeal.

The principal error assigned is that the verdict is not supported by sufficient evidence. The controlling facts developed at the trial are substantially as follows: Respondent on the 11th day of April, 1909, married one Frank Boroughs. Respondent and her husband prior to their marriage came from the state of North Carolina and were married at Ogden City, Utah. After respondent came to Ogden, she received about five hundred dollars from home, a part of which she received as the proceeds of the sale of property which she had sold, and the remainder was a gift. Fifteen hundred dollars she says her husband gave her about three

days after they were married. When she was asked with regard to this gift and what was said by her husband with respect thereto, her answer was: "Not other than to take care of it—gave it to me that I might invest it in any way that I wished. . . . We had a house in view. . . . We thought we would invest the money in and live in it." When she was further asked to state how her husband "came to give you that money," she said: "Well, not other than what is a man's is his wife's." She further said that she kept all of the money aforesaid in her trunk in the room where she and her husband lived; that both she and he had access at all times to the trunk, and that they were the only persons who did have access thereto; that during the forepart of the month of May, 1909, a large portion of the money was taken from the trunk in sums from two hundred and fifty dollars to five hundred dollars at a time; that on the 12th day of May five hundred dollars remained, and that that sum was taken by her husband on that day; that the money was all gambled against her will. It further appeared that her husband was seen gambling in appellant's gambling house at least twice. On one occasion he was seen to lose eight twenty dollar bills, amounting to one hundred and sixty dollars, and he was seen playing a game denominated faro, which, it seems, was played by first obtaining what by the witness are called chips. These chips, it seems, were of different denominations or values. The witness said that respondent's husband had in his possession about one hundred and fifty dollars worth of those chips, but whether he bought them with money, whether he had won any or all of them, or whether he finally was winner or loser, the witness did not know. This was practically all the competent evidence with respect to the gambling of the husband except the inference that he lost the money in that way at some time and at some place because he had the money at one time and had parted with it in some way by the 13th of May aforesaid. Counsel for respondent, however, places strong reliance upon what he insists amounted to an admission by one of appellants. The alleged admission came about as follows: When all the

money was gone, it seems respondent's husband told her he had lost it at gambling. She then called to see Mr. Peterson, one of the appellants, and she says she told him that: "My husband, Frank Boroughs, gambled two thousand dollars in your gambling house, and I am left without anything at all." She further told Peterson of her destitute condition, that she was indebted to various persons, and asked him to "give me just enough to go to my mother, who lives in South Carolina, and to pay those just debts which I owe." She further says that she told Peterson that two thousand dollars was the amount lost by her husband, "but, if he would give me one thousand dollars, I would never say another word and he would hear no more from me. . . . He told me he would study over it, and see what he could do about it." She said she gave Peterson three days to think it over. On the third day she called Peterson up over the 'phone, and her testimony proceeds as follows: "He told me that he couldn't afford—that that was the way they made their living, and he couldn't afford to listen to the whims of a woman." She said that she continued pleading with him, "and, he said if it was my money, I should have taken care of it before that hour, and that he couldn't afford to give it back." We remark that the evidence, if believed by the jury, was sufficient to sustain a finding that at one time respondent had in her possession the sum of two thousand dollars. In view of the verdict, however, the jury must have come to the conclusion that her husband had not made the gife of one thousand, five hundred dollars to her, but that he still regarded it as his own money.

While there is considerable evidence on behalf of appellants which is flatly contradictory of respondent's statements, yet it is not deemed necessary to notice any of it on this appeal, since, for the purpose of the question before us, we must assume what respondent said was true.

The principal assignment of error insisted on by appellants, stated in counsel's own language, is: "That the evidence is insufficient to justify the verdict, and that it is

against law." This assignment is supported by an attempt to specify the particulars wherein it is claimed the evidence is insufficient. Counsel for respondent, however, insits that the specifications are wholly insufficient, and that they do not conform to rule twenty-six of the rules of practice of this court. Counsel therefore insists that we must disregard the assignment. We remark that, while the particulars wherein the evidence is insufficient are perhaps not stated as fully and as specifically as they could have been, yet, in view of the whole record, we think the specifications are sufficient, and that they substantially comply with the rule aforesaid. The question to be decided, therefore, is: Is the evidence sufficient to support the verdict of the jury?

In the absence of a statute, probably the only right of action respondent had was to sue appellants as she did, namely, for money had and received by them for her use and benefit. To sustain this action, however, a plaintff must show that "there has been an actual receipt of money by the defendant or something equivalent to it." (Abbott's Trial Evidence [2 Ed.], p. 337.) In addition to this, "the evidence must tend to show a definite sum, or certain data from which by arithmetical calculation the jury may ascertain the sum." (Id., p. 340.) The only evidence from which it possibly could be found that appellants received any money belonging to respondent is that of the witness who saw her husband lose eight twenty dollar bills in appellant's gambling house about the date the last of respondent's money was taken from her trunk when the foregoing statements are considered in connection with the statement of another witness who at that time saw her husband with a "large roll" of paper money in his possession, and on the day following he wanted to borrow five dollars from the witness. But counsel for the respondent insits that, although it be conceded that apart from Peterson's admissions the evidence is insufficient to support the finding of the jury, yet, when his admissions are given effect, as they must be, they alone are sufficient to sustain the finding. Counsel does not

2

contend that the admissions were what are termed direct or express admissions, but, to state counsel's contention in his own language, he says: "Peterson impliedly admitted that the money was lost in the gambling house, and such admission is sufficient to sustain the verdict." The alleged implication is based upon the contention that at the time respondent told Peterson that her husband had lost money in his gambling house he did not directly nor categorically deny her statement. We are not prepared to hold that what Peterson said or failed to say is tantamount to an admission, however, that respondent's husband lost any money in his gambling house, or that the husband gambled in Peterson's house, or that the money was lost while the husband was playing with any person or persons who were connected with the house or who were the servants or agents of appellants. Nor is there the slightest evidence that Peterson at the time the alleged admission was made had any personal knowledge as to whether respondent's husband had gambled and lost any money in appellant's house. The only statement relied on in this regard by counsel is the statement attributed to Peterson "that he could not afford to give it (the money) back." When, however, the statements that Peterson made to respondent are considered as a whole, as they must be, it is very clear to us that Peterson, if he used the expression at all, did not use it in the sense that counsel now places upon it. Peterson emphatically told respondent at the first interview that he did not know anything about her husband's gambling—that he had no knowledge respecting the facts, and nothing is made to appear that he had any more knowledge respecting them on the second and final interview over the phone. Under such circumstances mere silence—that is, the mere fact that Peterson did not directly and in express terms deny respondent's claim that the money was gambled in appellants' house—would in law not amount to an admission.

The law upon this subject is clearly and tersely stated by Mr. Chief Justice Bell in the case of *Corser v. Paul,* 41 N. H., at page 29, 77 Am. Dec., at page 756, in the follow-

ing language: "Admissions may be implied from the acqui-
escence of the party; but, when it is acquiescence in the con-
duct or language of others, it must appear that such conduct
was fully known, or the language fully understood by the
party, before any inference can be drawn from his passive-
ness or silence. . . . But the silence of the party, even when
the declarations are addressed to himself, is worth very little,
as evidence, unless where he had the means of knowing the
truth or falsity of the statements." Mr. Jones in his work
on Evidence (2d Ed.), section 289, in speaking of implied
admissions by silence, says: "When there is no natural or
reasonable inference from the silence of a party that he ac-
quiesced in the truth of the statements, they should be ex-
cluded. There is hardly any ground to infer acquiescence
in such cases, unless it appears that the truth or falsity of the
statement made must have been *within the knowledge* of the
party sought to be charged." The text quoted from *Corser
v. Paul, supra,* and that from Jones, is supported by the
authorities.

The decision in the case of *Mattocks v. Lyman,* 16 Vt.
119, is to the same effect. While lack of space prevents us
from quoting all that was said between respondent and Peter-
son at the two interviews, yet we think we have quoted
enough to show that there arose neither a natural nor a rea-
sonable inference from what was said that Peterson admitted
by implication even that respondent's husband either gambled
or lost any money in his gambling house which was received
by him or by any of his agents or servants. In order to
make the admission worth anything as evidence, that is just
what would have to follow from Peterson's silence. More-
over, it is manifest from the whole tenor of respondent's
statement to Peterson that she neither knew nor pretended
to know the truth with regard to when or how much money, if
any, her husband had lost in appellants' gambling house.
She merely assumed that her husband had gambled there,
and therefore had lost the money. Nor was the statement
in the nature of an accusation or interrogation, but was
essentially speculative, in that respondent merely assumed

certain things concerning which neither she nor Peterson
seemed to have any knowledge. Under such circumstances,
we do not think it was the duty of Peterson to either affirm
or deny respondent's statements, and, if he was not, then, in
the eye of the law, he cannot be prejudiced by his silence.
If it were once conceded that silence under such circum-
stances would be sufficient to authorize a jury to find against
a party in an action for money had and received, then no
one would be safe from an attack of this character. So long
as there is no statute which prescribes and defines under what
circumstances and upon what evidence money lost by gam-
bling may be recovered back, we are forced to look to and
enforce the ordinary rules of evidence, regardless of the fact
that our sympathies are all with the unfortunate wife.

In this case there is some evidence upon which a jury could
base a finding that respondent's husband had lost one hun-
dred and sixty dollars of her money in appellants' gambling
house. From the evidence (and especially because
no explanation nor denial was made that the husband
lost the money as testified to by the witness referred
to, although one of appellants testified that he employed
"thirty-five or forty people" in the gambling house) the jury
were authorized to infer that since the money was lost in
appellants' gambling house under the circumstances detailed
by the witnesses, appellants did receive it. We cannot see,
however, how the verdict has any support except for the
one hundred and sixty dollars. So far as the chips, which
the witness says the respondent's husband had, amounting
to one hundred and fifty dollars, are concerned, it is just
as likely that he had won them as it is that he had paid that
amount of money for them to appellants. Moreover, there
is not the slightest evidence that respondent's husband lost
any money at that time, nor that he did not win some instead
of losing it. As we have seen, this action is one for money
had and received, and hence is governed by the rules of evi-
dence to which we have heretofore referred. Under those
rules, although we should assume that respondent's husband
lost some money when he was seen with the chips, yet there

is nothing to show, nor is there any data from which any inference can be drawn, what the amount lost, if any, was. There is therefore not sufficient evidence to support the verdict of the jury. But, as we have said, there is some evidence which in our judgment is sufficient to support a finding that appellants have received the sum of one hundred and sixty dollars belonging to the respondent. Upon this point the uncontradicted facts are that on the 12th day of May, 1909, respondent had five hundred dollars of the two thousand dollars left. The five hundred dollars was paper money, and was left in her trunk. On that day she left home and left her husband in charge, who was the only person who had access to the trunk in which the money was. When she returned home on that evening the five hundred dollars were not in the trunk. On the day following, the 13th, the husband of respondent was by a witness seen with a large roll of paper money containing some twenty dollar bills. On the evening of that day another witness saw the husband in appellants' gambling house, gambling. At that time the witness saw him lose while playing a game called craps in the gambling house of the appellants eight twenty dollar bills, or the sum of one hundred and sixty dollars. On the day after the evening aforesaid—that is, on the 14th day of May, 1909—the husband came to the same witness who saw him with the large roll of bills on the 13th and wanted to borrow five dollars from the witness. The only fact that is not established beyond question is the one of ownership of the one hundred and sixty dollars lost as aforesaid. It is suggested that it is just as probable that the one hundred and sixty dollars was part of the one thousand, five hundred dollars belonging to the husband as it is that it was part of the five hundred dollars belonging to respondent. We are of the opinion, however, that, taking into consideration all the facts and circumstances, the jury were authorized to find that the one hundred and sixty dollars lost as aforesaid was a part of respondent's five hundred dollars. It will be remembered that by the morning of the 12th day of May the husband of respondent had taken one thousand, five hundred dollars of

the two thousand dollars, and at that time only five hundred dollars remained. It is reasonably clear that the husband regarded the one thousand, five hundred dollars as his own and the five hundred dollars as belonging to respondent. In view of this there is no presumption that he took respondent's money with which to gamble so long as he had money of his own. Indeed, the presumption is to the contrary. The jury, therefore, had a right to infer that the five hundred dollars that were left in respondent's trunk on May 12th belonged to her. They also were authorized to infer that the husband took the same from the trunk on that day, and that the money he had and lost on the following day as detailed by the witness was respondent's money. The only difficulty with the verdict of the jury as it now stands is that there was no direct evidence, nor any fact from which the jury could infer, that the husband had lost the whole five hundred dollars in appellants' gambling house. While he may have lost that entire amount by gambling, yet it is just as probable that he lost it eleswhere than in appellants' gambling house. Not so with the one hundred and sixty dollars. As to that sum, there is positive evidence that he lost it in appellants' gambling house, and hence the jury had a right to infer that appellants received at least that amount of respondent's money. While the evidence upon the question of ownership is not as satisfactory as it might be, yet in our judgment there is some substantial evidence upon which to base a finding that appellants have received the sum of one hundred and sixty dollars of respondent's money for which they should account to her. Respondent, therefore, is entitled to a judgment for the sum of one hundred and sixty dollars with legal interest thereon from May 13, 1909, to the present time.

Ordinarily, in view that this is a law case, we should reverse the judgment unconditionally. In view, however, that it is practically certain that appellants have no defense as against the amount aforesaid, and in view that respondent may elect to take a new trial in case she has other evidence to show a greater liability, we shall

not do so in this case, but shall follow the case of *Foulger v. McGrath,* 34 Utah, 86, 95 Pac. 1004, upon this point.

It is therefore ordered that, in case respondent shall file with the clerk of this court within twenty days after notice of this decision her consent to remit from the judgment all except the sum of one hundred and sixty dollars with legal interest thereon, then the judgment will be affirmed without costs to either party; otherwise the judgment will be reversed, with costs to appellants.

McCARTY, J. (concurring).

I think the evidence conclusively shows that during the months of April and May, 1909, defendants were the proprietors of and conducted a gambling house in Ogden, Utah, known as the St. Louis Gambling Hall. In fact, it is admitted that defendants were following gambling as a business or profession at that time. And I think there is evidence from which the jury might well find: (1) That Frank Boroughs, plaintiff's husband, on May 12, 1909, took five hundred dollars of plaintiff's money from her possession, and on May 13, 1909, gambled and lost one hundred and sixty dollars of the five hundred dollars so taken in defendant's place of business, and that defendants won and received the one hundred and sixty dollars from Boroughs; (2.) that the money was gambled and lost by Boroughs without plaintiff's knowledge or consent. Regarding the ownership of the money, plaintiff testified that in May, 1909, she had five hundred dollars which she kept in a trunk together with one thousand, five hundred dollars which she claimed her husband had given her. On cross-examination she testified in part as follows: "Q. The five hundred dollars that you say you received from your mother, what was that, a gift? A. Why, yes; it was a gift in a way. Part of it was a gift, and about three hundred and fifty dollars was property that I sold back there to my mother. It was our estate. The other was a gift. . . . Q. You placed this money in a trunk in your room? A. I did. Q. Two thousand dollars in bills? A. Oh, you are mistaken. It was one thousand, five hun-

dred dollars that he gave me. Q. I know, and you had five hundred dollars besides that? A. Oh, yes. . . . Q. Did you use any of that money? A. No; I didn't. . . . Q. And the money continued to remain there how long? A. Well, he (Frank Boroughs) had taken it out all along through May. Q. Different sums? A. Yes; different sums at different times. Q. Now, what was the first sum that was gone out of there? A. . . . two hundred and fifty dollars. Q. And then the next, how long after before any more was gone? A. Well, sir, it was right along all through the month of May. Q. As large amounts as that? A. Yes. Large amounts along, five hundred dollars being the greatest amount. Q. In sums of two hundred and fifty and five hundred dollars, until it got reduced down to five hundred dollars; that is the last transaction? A. Yes; that is the last money *we had* of this ready money. Q. Then one time when you came home from the theater that was gone? A. It was the matinee of the afternoon of the 12th of May. Q. And that was gone. That took it all. A. Yes, sir." On re-direct examination plaintiff testified as follows: "Q. Did you ever consent to his gambling the money? A. Oh, I should say not. . . . I asked him not to, begged of him not to, pleaded with him daily not to."

J. S. Daniels, a witness for plaintiff, testified that Frank Boroughs came to his grocery store in Ogden on May 13, 1909, and showed him a roll of bills, and said (quoting) "there was four hundred dollars in the roll. I think there was a twenty dollar bill on the outside of the roll. . . . He had four twenties, a ten and a five and some silver in his pocket that he took out and showed me and he showed me this roll of bills." According to plaintiff's testimony, which, on this point, is not disputed, Boroughs prior to May 12, 1909, took from plaintiff's trunk sums of money ranging from two hundred and fifty to five hundred dollars, and on May 12, 1909, he took all that remained in the trunk of the two thousand dollars, namely five hundred dollars. Boroughs' money having been mingled with that which the record shows belonged to his wife, and the entire amount (two thousand

dollars) having been put into the trunk together, the legal presumption is that he withdrew his own money from the trunk before he took the five hundred dollars that belonged to plaintiff. (*Waddell v. Waddell,* 36 Utah 435, 104 Pac. 743.) Therefore I think it is clearly established that the five hundred dollars which the evidence shows Boroughs took on the afternoon of May 12, 1909, belonged to plaintiff. While it may be said that it is within the range of possibilities that Boroughs had not spent nor otherwise disposed of his own money at the time he took the five hundred dollars belonging to his wife, yet the jury might well conclude that such a thing, in view of all the facts and circumstances leading up to and surrounding the transaction, was not at all probable. In fact, I think the record shows affirmatively that the five hundred dollars taken from the trunk May 12th was practically all the money that the Boroughs had on that date. Plaintiff testified that the five hundred dollars taken from her trunk on the afternoon of May 12th was *the last money they had* of "this ready money," the two thousand dollars. Moreover, the evidence shows that on the following day (May 13, 1909) Bouroughs exhibited to the witness Daniels a roll of bills which he claimed amounted to four hundred dollars, and (again quoting from the testimony of Daniels) "he was quite proud of it and wanted I should see it. . . . He had four twenties, a ten, and a five and some silver in his pocket that he took out in his hand and showed me. . . . He was very liberal, and bought a cigar for us." The jury might well infer from these circumstances that, if Boroughs had been in possession of any money other than that mentioned by the witness, he would have shown it also.

But, aside from these considerations, the plaintiff, as I have pointed out, testified that the five hundred dollars taken from her trunk by Boroughs May 12th was the *last* of the "ready money" they had. This testimony, which is not disputed, when considered in connection with the other facts and circumstances referred to, was amply sufficient to support a finding of the jury that this money was practically all the money Boroughs had at the time of his interview with

Daniels. And the evidence of plaintiff and Daniels when considered in connection with the evidence set out in the opinion written by the Chief Justice is sufficient to support a finding by the jury that the one hundred and sixty dollars gambled and lost by Boroughs in defendants' gambling house on the night of May 13th was a part of the roll of bills that he showed to Daniels. I also think the evidence is sufficient to support a finding that the one hundred and sixty dollars was won and received from Boroughs by the defendants. The record shows that the defendants, with the assistance of about thirty-five or forty employees, conducted the games of chance and gambling devices carried on and run in their place of business. They would open up for business about nine o'clock in the morning and close about two o'clock at night. And, according to the testimony of defendants, they "closed sometimes one thousand dollars loser," and sometimes "that much winner;" that the winnings were all dumped together, "and a record kept of the amount lost or won." And, if there was any unusual play made one way or the other on the winning side or losing side, "they took notice of it." No claim is made, or even suggested, by the defendants that the patrons of their gambling house bet or gambled with each other, and that some customers or patrons of the house might have won and received the one hundred and sixty dollars lost by Boroughs. While the evidence on this point is not as clear as it might be, yet I think the only reasonable inference that can be drawn from the evidence is that the defendants, their agents and employees, conducted the games and gambling devices carried on in their place of business, and did the playing, betting, and wagering with the patrons of the house who came there and took part in the games, and that they, the defendants, represented either the winning side or the losing side of each wager that was made.

I therefore concur in the conclusions announced in the opinion written by the Chief Justice.

STRAUP, J. (dissenting).

I think there should be a new trial. I think the evidence is insufficient to sustain either the verdict of the jury or the findings of my Brethren. Plaintiff's husband was by occupation a steam fitter, receiving three dollars and fifty cents a day. He had been working for a railroad company in Ogden. Prior to that time he lived in South Carolina, where he was in business. She was married to him April 11, 1909, in Ogden, where they then lived. He left her in August of that year. Since then she has not heard of him. She testified that shortly after the marriage she received five hundred dollars from her folks in South Carolina, and that her husband handed her one thousand, five hundred dollars making in all two thousand dollars. This money she testified, was kept in a trunk in a room in Ogden. As is already suggested, and as I think is shown by the evidence, and as evidently was found by the jury, one thousand, five hundred dollars of the two thousand dollars belonged to the husband. She testified that all of the two thousand dollars was taken by him from the trunk at different times between the 1st and the 12th days of May, 1909, and that the last amount, five hundred dollars, was taken by him on the afternoon of the 12th while she was at a theater. She testified that she asked her husband not to gamble; that she pleaded with him not to do so, and that she did not consent "to his gambling the money." She also testified that each time her husband took any money she had knowledge of his taking it. It is not made to appear that she made any objection to, or complaint of, his taking it. She did not testify that any of the money was taken by him without her consent or permission, or against her will, or that she made any complaint, or concerned herself about the taking of it, until in September and after her husband had left her. I mention this not as showing that plaintiff's husband gambled any money with her consent, but as bearing on the question of ownership of the money. A witness testified that he saw plaintiff's husband on the 1st, 13th, and 15th days of May, 1909, in the defendants' gambling house. On the first occasion, the witness

testified he only noticed her husband playing, "but did not stop to notice what or how he was playing or how he was betting." There is no evidence to show that her husband then won or lost anything. The witness testified that on the 13th he and plaintiff's husband played "craps" in the defendants' house. He testified that plaintiff's husband on that occasion "started in with a five dollar note. I was playing quarters, and he was playing fives, and then he lost. Then he played twenties, twenty dollar notes. I lost two dollars playing quarters, and he was playing twenties, that would be two hundred dollars. As I lost a quarter he would lose a twenty. I saw him play eight tewnties, twenty dollars every throw." He further testified that he also saw him at a faro table, playing faro, with about one hundred and fifty dollars worth of "yellow chips," but that he did not stay to see how he came out, and that he did not know whether he quit winner or loser. On the last occasion, the 15th, the witness again saw plaintiff's husband in the defendants' house playing. He testified, "I never went around the game where he was playing," and consequently he did not know what he was playing, or whether he won or lost on that occasion. Now, it is the testimony given by this witness that plaintiff's husband on the night of the 13th lost one hundred and sixty dollars "playing or shooting craps," and the fact that he on that day exhibited to his grocer a roll of bills wrapped with a "twenty," which are pointed to in support of a finding that the defendants received from the plaintiff's husband the sum of one hundred and sixty dollars belonging to her. There is no evidence showing that her husband prior to the night of the 13th had no money of his own. In fact, I think the contrary is shown. While the evidence shows than on the night of the 13th he lost in the defendants' house one hundred and sixty dollars playing craps, it is not shown whether he lost it to the defendants or either of them, or to any of their agents or employees, or to a third person. Neither does the evidence show that he then, or at any time, exhibited, or parted with, or paid, any money to the defendants, or to any one. From the mere testimony—and there is

no other—that the plaintiff's husband lost one hundred and sixty dollars in the defendants' gambling house "playing or shooting craps," I cannot judicially know, nor could the jury presume, that the defendants, and not another, won and received the lost money. We have no statute permitting a recovery of money lost in gambling, as is provided by many statutes, and, by some, rendering the proprietors or keepers of a gambling house liable whether the money lost in their gambling house was received by them or by another. To entitle the plaintiff to recover, it was incumbent upon her, not only to prove that her husband gambled and lost a definite sum of money in the defendants' gambling house, but also that the money gambled and lost by him was her money, and that he, without her knowledge and consent, took it and gambled it—wrongfully appropriated it to his own use—and that the defendants by a participation in such gambling transactions, or without other lawful and valuable consideration, received it. I have already adverted to the insufficiency of the evidence to show that the defendants received the one hundred and sixty dollars which, as testified to by the witness, was lost by the plaintiff's husband. Neither is the evidence sufficient to show that such money lost by him was plaintiff's money. The evidence as strongly points to the fact that it was his money as that it was hers. Fifteen hundred of the two thousand dollars in the trunk belonged to him. Let it be assumed, as in fact was testified to by the plaintiff, that her husband between the 1st and 12th days of May took all of it. She testified that the first of the two thousand dollars was taken about the 1st of May, and that he then took two hundred and fifty dollars; that later, and before the 12th, at different times, he took other amounts, from two hundred and fifty dollars to five hundred dollars; and that on the 12th there remained but five hundred dollars, which was also taken by him on that day. The evidence shows that all the money lost by him in the defendants' house was one hundred and sixty dollars. He lost that on the evening or night of the 13th. It is not shown that he gambled or lost money at any other place, or that he other-

wise paid out any money. The evidence shows him to have been in the defendants' house but three times. May 1st, 13th, and 15th. It is not shown that he lost anything the first time. If he then did lose anything, all that he lost of the two thousand dollars was two hundred and fifty dollars, for that was all that he then had taken of it. From then until the 13th he was not seen the the defendants' house, nor in any other gambling house, nor engaged in gambling anywhere; nor is it shown that he otherwise disposed of any money. Yet between the 1st and the 13th days of May he took from the trunk all of the two thousand dollars, except the two hundred and fifty dollars which was taken by him about the 1st. Now, let it be assumed that the last five hundred dollars in the trunk taken by him on the 12th was plaintiff's money, still, it is just as probable that the money so lost by him was a part of the one thousand, five hundred dollars which belonged to him as of the five hundred dollars which belonged to her.

The presumption, if any at all is to be indulged, is that he gambled his own money, and not that of his wife.