## TEXAS CREOSOTING CO. et al. v. HARTBURG LUMBER CO. (No. 931—5029.)

Commission of Appeals of Texas, Section B. Jan. 2, 1929.

E. E. Easterling, W. R. Easterling and Holland & Cousins, all of Beaumont, for plaintiffs in error.

Gordon, Lawhon, Davidson & Sharfstein, of Beaumont, and W. N. Foster, of Conroe, for defendant in error.

SHORT, P. J. The plaintiffs in error were defendants in the trial court in this suit, and, the district court having rendered a judgment in favor of the defendant in error, which judgment on appeal was affirmed by the Court of Civil Appeals, the plaintiffs in error have been granted a writ of error by the Supreme Court.

The case was tried in the district court without the intervention of a jury, and no findings of fact or conclusions of law were filed by the trial judge, and with the record in this condition, as said by the Court of Civil Appeals in its opinion: "If the trial court's judgment can be sustained upon any theory * * * it should be affirmed."

The statement of the case made by the Court of Civil Appeals is in the main correct. 298 S. W. 645.

The pleadings of the parties are those usually used in an action of trespass to try title, the property involved being several tracts of land in Newton county, and incidentally for the value of certain pine timber standing and growing thereon or which had been taken off of them by the defendant in error, for the recovery of which cross-actions were filed. The judgment of the trial court disposed of all the issues in the case in favor of the defendant in error. The Court of Civil Appeals in its opinion says:

"All parties to this controversy claim title to the timber involved from one C. T. Noble, as their common source."

An inspection of the record shows this statement to be slightly incorrect. An agreement of the parties is found in the statement of facts as follows:

"It is agreed that H. W. Benton is the common source of title and that at the time he executed deed to C. T. Noble of June 25, 1902, which deed is of record in Vol. V, page 399 of the Deed Records of Newton County, Texas, he was the owner of the entire estate including land and timber, of the land described in plaintiff's first amended original petition."

This excerpt from the agreement sufficiently indicates the fact that H. W. Benton and not C. T. Noble is the common source of title. The statement made with reference to this matter in the opinion of the Court of Civil Appeals is not important when the issues discussed in the opinion are considered. These issues thus discussed relate to the construction of certain language in the general warranty deed from C. T. Noble, the assumed common source, to the American Real Estate & Investment Company, dated October 10, 1902, conveying the property in controversy. This language is as follows: "It being understood that the timber is excluded and subject to removal at any time"; and also the construction of certain language in a deed from the American Real Estate & Investment Company and C. T. Noble to the St. Louis Union Trust Company, dated April 29, 1908, conveying the land in controversy, this language being "excepting and subject to any and all outstanding timber contracts and conveyances up to April 29, 1908."

It appears that on October 15, 1907, C. T. Noble had executed to H. J. Becker a certain instrument of writing conveying to Becker all the pine timber on the land sued for that was 8 inches in diameter, 24 inches from the ground, and in which Becker was allowed 5 years from that date to remove the timber, and that on January 21, 1908, Noble had executed a similar instrument of writing to Becker conveying all of the timber of every kind, except the pine timber already conveyed, and in this second deed Becker was given 5 years in which to remove the timber; the time being extended to 8 years by another instrument dated the same as the second instrument. In the first deed there was a provision as follows:

"After which said time the said privilege shall cease and any timber then standing and uncut shall be the property of the grantor herein."

It further appears from the record that the timber growing on the land in 1902 was both pine and hardwood, the pine timber having a marketable value, but it inferentially appears that the hardwood did not have at that time any marketable value.

Plaintiffs in error contend that the legal effect of the deed from Noble to the American Real Estate & Investment Company of date October 10, 1902, was to vest the fee-simple title to the soil generally in the American Real Estate & Investment Company, and a like fee to the timber as a separate estate in C. T. Noble; while the defendant in error contends that the legal effect of this deed was to reserve the timber in the grantor as a chattel interest, and not as a fee-simple estate in the timber, and also to reserve in the land a sufficient interest for the sustenance of the timber, and it further contends that Noble's vendee and its assigns had lost the right to remove the timber, because it further appears that it was not removed within a reasonable time after the execution of this deed, more than 20 years having elapsed. The Court of Civil Appeals agreed with the contention of the plaintiffs in error, citing Lodwick v. Taylor, 100 Tex. 272, 98 S. W. 238, 123 Am. St. Rep. 803.

The Court of Civil Appeals further held that Becker did not acquire the title to any of the timber in controversy by virtue of the execution and delivery to him by C. T. Noble of the two instruments, but only acquired the right to remove the timber within the time specified in those instruments, citing Houston Oil Co. of Texas v. Hamilton, 109 Tex. 270, 206 S. W. 817; Carter v. Clark Boice Lumber Co. (Tex. Civ. App.) 149 S. W. 278; Conn v. Houston Oil Co. (Tex. Civ. App.) 218 S. W. 137; Houston Oil Co. v. Bunn (Tex. Civ. App.) 209 S. W. 830; Martin v. Southern Pine Lumber Co. (Tex. Civ. App.) 284 S. W. 918, and in construing the language above quoted of the deed from the American Real Estate & Investment Company and C. T. Noble to the St. Louis Union Trust Company of date April 29, 1908, declared its effect to be a conveyance by the grantors to the grantee of the fee-simple estate in the timber owned by Noble as well as a conveyance of the land subject to Becker's rights in the timber under the instruments that Noble had executed in his favor upon the theory that it could not be successfully contended that it is clear from the language of the instrument as a whole that it was the intention of Noble to except from the operation of that instrument the timber on the land conveyed, and that, if the language employed in that instrument leaves any doubt as to Noble's intention with reference to what was to be conveyed, the instrument should be construed so as to confer upon the grantee the greatest estate that its terms would permit. Hancock v. Butler, 21 Tex. 804; Cartwright v. Trueblood, 90 Tex. 535, 39 S. W. 930; Calder v. Davidson (Tex. Civ. App.) 59 S. W. 300.

The Court of Civil Appeals then affirms the judgment of the trial court for the reasons given, stating that it was the duty of the court to affirm the judgment of the trial court, since it had found that a proper judg-

ment had been rendered in the case, regard-less of what reasons the trial court may have had for rendering it. With this conclusion of the Court of Civil Appeals the plaintiffs in error disagreed, and in their application to the Supreme Court for writ of error assigned it as error.

While we have given a brief statement of the case in so far as the matters discussed in the opinion of the Court of Civil Appeals are concerned, and we may add by the parties in their respective briefs, still in view of the conclusion we have reached it will be necessary to make a further statement.

The events material to the question we have in mind transpired between January 17, 1880, when Orville McIlvaine, a citizen of the city of St. Louis and state of Missouri, died testate, leaving property of the approximate value of $300,000, consisting of lands, bonds, promissory notes, cash, and other property, and August 25, 1926, when the defendant in error made its last report to the plaintiffs in error of the amount of timber it had cut by agreement from the lands pending the termination of this lawsuit. The testimony in the case is without dispute, but it is voluminous; more than 100 pages being used in stating it.

The defendant in error claimed the property in controversy under what may be termed the Woodson title. Woodson claimed the property under the deeds we have discussed. He was an assign of the trustee under the will of Orville McIlvaine, deceased, and was also related to the family, at least by marriage.

The plaintiffs in error claim the property in dispute, which, in fact, is the standing merchantable timber upon the land at the present time, except that cut by agreement therefrom by the defendant in error (and they claim the value of that) under the same instruments supplemented by conveyance from C. T. Noble to C. A. Dyer, Sr.

Under the provisions of the McIlvaine will, a man by the name of H. N. Bryan was given plenary powers to handle the property as his own, and, upon his failure or refusal to do so, the daughter of McIlvaine, who was the immediate beneficiary, was authorized to appoint another with similar powers. Mr. Bryan ceased to act as trustee on January 6, 1885, and Charles A. Dyer, Sr., was substituted in his place. Dyer gave a bond in the sum of $150,000 with his brother and another as sureties, and proceeded to treat the property as his own, paying in the meantime to the immediate beneficiary annually $2,000 until October 30, 1906, when he was removed from the trusteeship, and the St. Louis Union Trust Company was substituted in his stead. This company immediately brought a suit in one of the courts of the city of St. Louis to compel Dyer to render an account of his trusteeship, and an auditor was appointed with instructions to take testimony and make a report of the state of the account between Dyer and the estate of McIlvaine. The auditor did this, and, the report having been adopted, a judgment was entered accordingly.

The statement of facts in this case contains a part of that report as well as the judgment of that court. No effort was made to contradict the matters stated in either report or the judgment, and it is fair to assume that the trial court considered that part of the record, and gave it such consideration in reaching the facts upon which it based its judgment as he was authorized to do under the law. The auditor's report contains sixteen typewritten pages of the statement of facts. It shows that Charles A. Dyer, Sr., was then insolvent; that his brother was dead and his estate insolvent, and the other surety on the bond was also insolvent; and that practically all of the estate of Orville McIlvaine, of the value of nearly $300,000, when he took possession of it, had been squandered or otherwise so handled as to be almost a total loss to the beneficiaries, and during all of the time he acted as trustee he kept no accounts with the estate, but mixed and mingled the property with his own and with the American Real Estate & Investment Company, shown to have been a corporation in which he held the controlling interest, and which was used by Dyer in his dealings with other people and in the disposition of the property of the McIlvaine estate for his own private purposes. Among the other property belonging to the estate received by Dyer was $35,000 of government bonds, nearly $15,000 of secured notes, and several pieces of real estate of the aggregate value of nearly $300,000. When Dyer was first called upon to render an account of his trusteeship, he filed an answer alleging that the estate was due him $8,000, and afterwards in an amended answer stated that he was due the beneficiaries of the will of McIlvaine more than $24,000. The auditor's report showed that he was indebted to the beneficiaries of the estate more than $280,000. In speaking of the manner in which Dyer kept, or rather failed to keep, an account with the estate, the report of the auditor, among other things, says:

"No such account is presented here as the law contemplates and in this connection I shall summarize the facts that warrant my conclusion of conversion by the trustee from the outset of his taking charge.

"The evidence is clear that from the very beginning of his administration of this trust defendant treated it as though it were his personal affair. He mingled the moneys derived from the assets of the trust estate with his private funds, later with the funds of a company in which he was the heaviest stockholder, swelling his and its funds for their own purposes; he checked upon the funds as his own or later as the company's;

he never at any time had the trust assets (of a personal nature) of any description so ear marked or set apart that they could have been distinguished from his own personalty, or that belonging to his clients in the real estate business in which it seems he was engaged, though he claimed to have some of the investments entered to the credit of the estate in books of his own which were never produced. He never kept a separate book or set of books for this important trust, one involving large sums of money, and many financial transactions in the way of collections, sales, reinvestments, etc. It would appear from his admissions read in evidence that such accounts as he kept were kept in his books of account that included his individual business, and even those as before stated, were not in evidence for me to judge how much of a record or account of trust affairs was kept in this way.

"This was his method or rather lack of method, although he sold or traded all the realty, disposed of all the available personalty and his voluminous statement filed shows receipts and disbursements extending over twenty-one years, embracing hundreds of items and aggregates $640,276.89 of receipts and $609,908.37 of expenditures.

"He rendered but four or five statements of account to the life tenant and none since 1899 although the estate had been in his custody over twenty-one years when this action was commenced. He did not keep her advised of the conditions of the estate and what he was doing in the way of selling, investing, etc. and indeed seldom even talked to her in general terms about her and her children's interests. She got in all $42,907.08, generally getting about $2,000 a year, at first in quarterly installments. Apparently he treated the estate for the purpose of giving her some part of what he had converted, as though she were only entitled to get $2,000 per annum, when of course she was entitled to all the net income, and the estate properly and providently managed, would unquestionably have yielded her a very much larger amount than she received. After 1899 she got no statement from him until March, 1905, when he sent her a statement showing her account overdrawn, which it is needless to say was very far from the fact."

This report also states that the American Real Estate & Investment Company was Charles A. Dyer, Sr., in another guise, and that the latter began turning over bodily to this company the assets in his hands as early as July 15, 1899, being the remains of the valuable properties, real and personal, that came into his charge in 1885, and that he had long since converted to his own use this particular company's notes found to aggregate $149,900, purported to be secured by collateral deeds not recorded on many thousand acres of land lying in Kentucky and Texas.

The chain of title to the property in controversy under which each of the respective parties to this litigation claim, the defendant in error upon the one hand and the plaintiffs in error upon the other, has its inception in the conveyance of H. W. Benton, the common source, to C. T. Noble, dated June 25, 1902, and is projected therefrom by the same instruments until a prong had been reached by the execution and delivery of the deed of the St. Louis Union Trust Company under the last will and testament of Orville E. McIlvaine, deceased, dated August 13, 1917, to the heirs of Minerva Muschanney, the daughter of Orville E. McIlvaine, conveying all of the lands described in the plaintiff's petition without any reservations. The defendant in error holds under this title. After C. T. Noble and the American Real Estate & Investment Company had executed the deed dated April 29, 1908, to the St. Louis Union Trust Company, which deed has already been mentioned, one of the grantors, C. T. Noble, in that deed, according to the record, does not appear to have taken any further action with reference to the property until March 25, 1925, on which date he executed and delivered an instrument in the form of a conveyance, which, after reciting the fact that the warranty deed dated June 25, 1902, from H. W. Benton to himself merely conveyed the legal title to that property to him, and that the property had been held in his name for the use and benefit of C. A. Dyer, the real purchaser and owner, and that on the 10th day of October, 1902, at the request and direction of the said Dyer, the real owner, he had conveyed to the American Real Estate & Investment Company a part of the estate in said lands, specially excepting therefrom the timber as an estate in said land, all of which said timber estate was retained in said deed in his name as the legal trustee for the use and benefit of C. A. Dyer, the real owner thereof, this language is used:

"Therefore, know all men by these presents, that for and in consideration of the premises above set out and $1.00 in hand cash paid by C. A. Dyer, I hereby grant and convey to said C. A. Dyer the legal title to said timber estate in the above described land fully described in said deed from C. T. Noble to the American Real Estate & Investment Company of Missouri, dated October 10, 1902."

The plaintiffs in error hold under this instrument, though the record further shows that in the meantime C. A. Dyer, Jr., a son of C. A. Dyer, Sr., had received a conveyance of the timber from C. A. Dyer, Sr., dated the 5th day of October, 1926, and that on the 20th day of February, 1922, C. A. Dyer, Jr. had executed a general power of attorney in favor of C. A. Dyer, Sr., authorizing him "to sell and convey and adjust any lawsuits now existing or bring any suits necessary in reference to any land that C. A. Dyer, Jr. owned in the State of Texas," and especially

describing the land in controversy, and that, acting under this power of attorney, C. A. Dyer, Sr., conveyed to L. T. Grubbs, by deed dated February 28, 1925, all the pine timber standing and growing upon a part of the land in controversy, and that L. T. Grubbs on March 31, 1925, conveyed this property to the plaintiff in error O. D. Butler. There is also a deed in the record conveying the same property from M. J. Bass to L. T. Grubbs and C. E. Slade dated August 23, 1922.

It will be recalled that C. T. Noble, on October 15, 1907, had conveyed the right to remove the pine timber from these lands to H. J. Becker, and on January 21, 1908, had conveyed to Becker the right to remove the hardwood timber from these lands, and on the same date had executed an instrument extending the time three years beyond the original date of five years within which he had the right to remove the timber, and that in one of these instruments there was a provision that any timber remaining on the lands after the expiration of said period was to revert to the grantor, which was, of course, apparently C. T. Noble. George T. Woodson, the immediate grantor of the defendant in error, conveyed the property in controversy by deed dated January 21, 1925, and this deed was filed for record February 4, 1925, which latter date is anterior to the date of the instrument executed by C. T. Noble to C. A. Dyer, Sr., as well as to the deeds under which the other plaintiffs in error hold, except as hereinbefore stated, and also except as to the above-mentioned deed from Bass to Grubbs and Slade. Bass does not appear in the record to be connected with the Benton title nor with any other individual asserting a claim to the property in controversy. It further appears from the record that the corporations whose names have been mentioned, as well as all the individuals whose names have been mentioned either as grantors or as grantees, were citizens of the state of Missouri and city of St. Louis, until Woodson conveyed the property to the Texas corporation, the defendant in error, after which date the grantees appear to be citizens of the state of Texas.

The district judge trying this case may have found from the testimony, which is undisputed, that the $28,900 acknowledged to have been paid in cash to H. W. Benton for the land in controversy apparently by C. T. Noble, but in reality by Charles A. Dyer, Sr., belonged to the estate of Orville E. McIlvaine, and that the promissory notes which were executed by C. T. Noble to H. W. Benton amounting to $7,600 were paid with money belonging to said estate. The trial judge may have also found that the execution of the instrument by C. T. Noble to the American Real Estate & Investment Company some four and one-half months thereafter, apparently conveying to that company the property in controversy, with the reservation that "the timber is excluded and subject to removal at any time," was but a part of a fraudulent scheme outlined in the record on the part of C. A. Dyer, Sr., to change the identity of the property belonging to the estate by apparently making this corporation its owner.

█ █ The trial judge may have also found that while C. T. Noble was the apparent owner of the property at one time, and the American Real Estate & Investment Company thereafter apparently became the owner, yet the real ownership of all the property conveyed by H. W. Benton to C. T. Noble belonged to the estate of Orville McIlvaine, and that, the St. Louis Union Trust Company having been vested with the power to demand and receive from C. A. Dyer, Sr., whatever property belonging to said estate could be identified, or its equivalent, it had done so by acquiring for the use and benefit of the estate and the legatees under the will the real title to the property conveyed by H. W. Benton to C. T. Noble, except in so far as it had been appropriated by H. J. Becker under and by virtue of the instruments executed by Noble to him, giving him the right to take from the land the timber within a certain date, which date had become one of the past by more than 9 years. The trial judge may have found several other facts of a material nature from the circumstances detailed in the statement of facts which, either independent of, or in connection with, those specially mentioned in this opinion, may have established a sufficient predicate for him to conclude that a constructive trust had been established in favor of the estate of Orville E. McIlvaine and the legatees, and to compel the conclusion, as a matter of law, that the property in controversy belonged to the defendant in error, which is shown to hold this title thus emanating from the estate of Orville E. McIlvaine. A constructive trust is one which arises purely by construction of equity and is entirely independent of any actual or presumed intention of the parties. It is one which arises entirely by operation of law without reference to any actual or supposed intention of creating a trust, and is often directly contrary to such intention. It is one entirely in invitum, and is forced upon the conscience of the trustee for the purpose of working out right and justice and frustrating fraud. A constructive trust may be established by parol evidence in a case of actual or constructive fraud. Fisher v. Wood, 65 Tex. 205; Everett v. Henry, 67 Tex. 404, 3 S. W. 566; Hughes v. Delaney, 44 Tex. 521; Hendrix v. Nunn, 46 Tex. 141; 39 Cyc. 26; Humphreys v. Butler, 51 Ark. 351, 11 S. W. 479; Robinson v. Pearce, 118 Ala. 273, 24 So. 984, 45 L. R. A. 66, 72 Am. St. Rep. 160; 26 R. C. L., Trusts, pars. 78, 98.

Assuming that the trial judge found facts sufficient to establish a constructive trust in favor of the legatees under the will of Or-

ville McIlvaine, then, under the admission made by Noble in his deed to C. A. Dyer, Sr., the legal effect of that deed was merely to invest the bare legal title in C. A. Dyer to the timber, a superior title having always remained in the representatives of the estate of Orville E. McIlvaine, deceased, and under this phase of the case the construction of the deed dated April 29, 1908, as well as that of October 10, 1902, would be immaterial, since Noble had nothing to convey, and in fact conveyed nothing by that deed except the bare legal title to the property.

■■ However, it is not at all necessary, in order to sustain the judgment rendered by the trial court in this case, to rest it upon the basis we have just discussed. The Court of Civil Appeals reached the conclusion that the most reasonable construction of the language in the deed of April 29, 1908, *under all the facts and circumstances*, is that it was the intention of Noble in executing it to convey to the grantee all the interest he had in the land and timber, subject only to whatever rights Becker had in the timber under the so-called timber deeds that Noble had executed in his favor, and further that it is clear from the language of the instrument as a whole that it should be construed to confer upon the grantee the greatest estate that the terms of the instrument will permit, and that it is clear from the language of this instrument that it was not the intention of Noble to except from the operation of that instrument the timber on the land, except that which Becker might remove within the time he had. When we consider the fact that Noble never paid anything either for the land or timber, and never asserted any interest in it, in connection with the further fact that Becker had apparently paid a large sum of money for this timber, and had been given 8 years in which to remove it, and that C. A. Dyer, Sr., whom Noble says furnished the money to pay Benton for the land, had been convicted of conversion of the trust estate of Orville E. McIlvaine, and had been compelled to surrender the purchase-money notes executed by the American Real Estate & Investment Company to Noble on this land, as well as to deliver up all other property discovered by the court to which the estate of Orville E. McIlvaine was entitled, all of which transactions occurred about the same time the deed under discussion was executed, it being the last of that series, it becomes evident that the conclusion of law stated in the opinion of the Court of Civil Appeals is amply justified.

Moreover, in the light of the facts last above stated, and in connection with the further fact shown by the record that the conveyance by Noble to the American Real Estate & Investment Company, wherein he reserved the timber, was not either a timber contract or a conveyance of timber, but that the instruments executed by him to Becker in common parlance were of that character, it is apparent that the conclusion reached by the Court of Civil Appeals on this particular subject is the correct one. The phrase "outstanding timber contracts and conveyances up to April 29, 1908," could not reasonably have referred to any other instruments except those held by Becker, since the record fails to indicate the existence of any other such *outstanding* contracts and conveyances. The word "outstanding," as used in this connection, has the same legal meaning as it has in the phrase "outstanding title," and refers to timber contracts and conveyances held by strangers to the Benton title and in opposition to those holding under the Benton title, and as being independent of the title held by Noble. An outstanding title is one on which a stranger could recover the property against either of the contending parties. 29 Cyc. 1545. Such being the situation, it could not reasonably have referred to the instrument dated October 10, 1902, nor to any other instrument to be found in this record, except as we have indicated.

The language used by the Court of Civil Appeals in its opinion that: "We agree with counsel for appellee that the most reasonable construction of that instrument [the one from Noble to the St. Louis Union Trust Company], *under all the facts and circumstances* [italics ours], is that it was the intention of Noble in executing it to convey to the grantee, St. Louis Union Trust Company, all title and interest that he had in the land and timber, subject only to whatever rights Becker had in the timber under the timber deeds that Noble had theretofore executed in his favor," aptly, fully, and correctly states our view on this subject, and we therefore recommend that the judgment of the Court of Civil Appeals affirming that of the district court be affirmed.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals both affirmed, as recommended by the Commission of Appeals.