SPENCER et al. v. PETTIT et al.　(No. 3227.)

Court of Civil Appeals of Texas.　Amarillo.
May 8, 1929.

Rehearing Denied June 5, 1929.

Chas. E. Coombes, of Stamford, and Bean & Klett, of Lubbock, for appellants.

Vickers & Campbell and Lockhart, Garrard & Brown, all of Lubbock, for appellees.

HALL, C. J. This is the second appeal of this case. For the opinions disposing of the controversy on the former appeal, see (Tex. Civ. App.) 268 S. W. 779, and (Tex. Com. App.) 2 S.W.(2d) 422.

Since the former appeal, the appellees, plaintiffs in the court below, have filed their second amended original petition, complaining only of W. E. Spencer, J. E. Spencer and J. H. Pettit as defendants, alleging: That appellees were, at the time the suit was filed, the minor children of J. H. Pettit and Amanda Elizabeth Pettit. That their mother died April 1, 1910, leaving surviving her her husband, J. H. Pettit, these appellees, and three adult children. That the appellees were minors on the 1st day of January, 1920. That at the time of the death of their mother, the community estate of herself and her surviving husband, J. H. Pettit, consisted of certain personal property of the total value of $32,-500, and of three certain sections of land in Lubbock county of the value of $38,400. That the personal property consisted of 650 cattle, 25 work horses and mules, and of certain farming implements, leases, and household furniture. That at the time of their mother's death, the personal property belonging to the community estate was incumbered for the sum of $7,500, said incumbrance being evidenced by a chattel mortgage upon the cattle. That the real estate was incumbered in the sum of approximately $5,000, and that the net value of the estate, real and personal, over and above all debts and incumbrances, was $58,400. That upon the death of their mother, plaintiffs inherited and became the owners of an undivided one-third interest in all of said property. That at and prior to their mother's death, the said property constituted what is known as the Pettit ranch, and was in the possession of and being managed and used by their father, J. H. Pettit, for ranching purposes.

That no administration was ever had upon the estate of their mother, and that no part of the community estate of their deceased mother has ever been set apart or paid to them. That after their mother's death, appellees assisted their father in the operation and management of the ranch, and none of the property was ever partitioned or set apart to any of the children. That the estate so operated prospered and increased in value until the 22d day of September, 1919, at which time the personal property, consisting of live stock, farming implements, etc., was of the reasonable total value of $76,700, which was incumbered at that time to the extent of $31,000, leaving a net value of said personal property of $45,-700. That during the time from the death of their mother to September 22, 1919, their father acquired additional real estate, which is specifically described in the amended petition, of the fair market value of $178,200, which was incumbered to the extent of about $112,-860, and that on said last-named date, the total net value of real and personal property belonging to their father, his adult children, and these appellees amounted to $158,560.

That on September 22, 1919, the defendants sold and converted all of the above-described personal property to their own use and benefit and have withheld the proceeds from the sales of said personal property from appellees. That appellees have not received anything whatever as their share of said property or its proceeds. That said property was first sold by J. H. Pettit to the Spencers on or about September 22, 1919, and immediately thereafter said Spencers disposed of all of such property and placed the same beyond the reach of plaintiffs, to their damage in the sum of $15,233, that being one-third of the net value of such property. They charge that Pettit and the said Spencers had knowledge of the interest and ownership of appellees in all of said property, as the heirs of their deceased mother, and that they are tenants in common, with the said Pettit and the Spencers, of the property remaining unsold, which consists of about 2,291 acres of land. That said land has increased in value approximately $17.50 per acre. That the Spencers have incumbered said property and have so burdened it for the purpose of rendering it unprofitable to plaintiffs and with the intent of placing it ultimately beyond recovery by plaintiffs. That at the time said lands were acquired by the Spencers, they were of the reasonable value of $30 per acre, less the incumbrances then existing to the extent of about $11 per acre. That the reasonable annual rental value

of all of said lands was $2 per acre since the 22d day of September, 1919.

The appellees further allege that the property originally constituting the community estate of J. H. Pettit and his wife, by use and investment, increased and enhanced in value. That the said J. H. Pettit used and managed the community estate after the death of Mrs. Pettit. That he sold the live stock and other personal property during the nine years after the death of their mother, while he operated the ranch, and invested the proceeds of live stock and other personal property, which he sold, in lands and in other live stock. That when the live stock upon the ranch were depleted, J. H. Pettit would purchase other cattle with the proceeds of stock which he had sold and would pledge the property on hand for the payment of the purchase money for other cattle acquired by him. That in such transactions, he usually paid part cash for cattle and for other adjoining real estate, and when live stock so purchased would increase, and would be ready for market, he would sell them and invest the proceeds and profits in other live stock and in the real estate above described. That during said nine years he mixed and mingled all of such property with the original community property; but throughout all such transactions, the integrity of the ranch was maintained and operated as the Pettit ranch, and during said time the said J. H. Pettit recognized the interest of appellees in such property and in all additional property acquired by him, and that said increase in the amount and value of property was for himself and appellees.

The appellees further allege that as part payment for the land conveyed to the Spencers by J. H. Pettit, the latter accepted oil and gas leases and oil stock which were worthless.

The Spencers answered by general demurrer, special exceptions, general denial, and pleaded ratification, waiver, release, limitation, purchase for value in good faith without notice, and res judicata in that the rights of the appellees had been fully adjudicated and settled in a partition suit had between appellees and the Spencers.

The answer of the defendant Pettit admitted substantially the cause of action as alleged by plaintiffs, and prayed for judgment over against the Spencers for any sum that should be adjudged against him by reason of the fraud practiced upon him by the Spencers in inducing him to exchange the property in part for the worthless oil leases and stock.

The adult children of Pettit and wife are not now parties to this suit.

The case was submitted to a jury upon special issues, and, in response, the jury found that some of the cattle, sheep, other live stock and farming implements which J. H. Pettit sold to the Spencers in 1919 were acquired by Pettit through the use and investment of the proceeds of the property of himself and his

deceased wife and from the increase of said property, and that the value of one-third of said property, over and above the debt held by the Drovers' National Bank against Pettit, was $4,332.87. That real estate to the extent of 5,940.6 acres was acquired by Pettit by using and investing the proceeds of the community property of himself and wife, and that said real estate was worth $20 per acre in September 22, 1919. That the Spencers had notice of appellees' interest in the real and personal property in controversy at the time they purchased it from J. H. Pettit. That it was the intention of Pettit, at the time he acquired the property in controversy and executed notes and made part payment thereof, to pay such notes out of the common property of himself and children. That the rental value of the lands in controversy was $1 per acre per annum.

The court rendered a judgment in favor of appellees for 1,980.2 acres of land and appointed commissioners to partition the real estate. Judgment was also rendered against the Spencers in favor of appellees for the sum of $6,737.60.

■ The first contention to be considered is that the court erred in refusing to peremptorily instruct a verdict in favor of appellants, because from the undisputed evidence it affirmatively and conclusively appears that appellees failed to trace and identify any of the proceeds or increase of the property of the first marriage into any of the specific property sold by Pettit to the Spencers.

This contention was made upon the former appeal and was overruled, and we think it should be overruled again. The appellants quote certain statements from the testimony of J. H. Pettit, which they insist show that. appellees did not trace their share of the community estate into the property which their father sold to appellants in September, 1919.

We have carefully reviewed the statement of facts, and we think the evidence is sufficient to sustain the finding of the jury upon this issue. It is conceded that all the property owned by J. H. Pettit and his first wife at the time of the wife's death April 1, 1910, was community property. This property consisted of three sections of land, and at the time of the wife's death there was an indebtedness against it of $5,000. This sum was never paid by Pettit out of any of the community property. The record shows that by a judgment rendered in the district court of Lubbock county at the December term, 1921, the appellees were given their interest in the three sections of land and that they took it under the terms of the judgment subject to a proportional part of the indebtedness against it, and that the remainder of the three sections was set apart to the Spencers, incumbered with the proportionate part of said indebtedness.

■■ Pettit testified that at the time of his

wife's death, he owned between 600 and 650 head of cattle, which were worth from $40 to $50 apiece. These cattle were incumbered by a chattel mortgage to secure an indebtedness of $7,500. According to these figures, the cattle were worth from $24,000 to $32,500, and the indebtedness against them could have been paid by a sale of less than 200 head. The only other debts existing against the community at the time of Mrs. Pettit's death, according to the testimony of Pettit, were the expenses of her last sickness and burial. The record does not show the amount of this indebtedness. A simple calculation will show that Pettit had on hand at that time cattle worth from $17,000 to $26,000 after the indebtedness of $7,500 which existed against them were paid. Enough cattle were sold to pay this debt within about 35 days after the death of Mrs. Pettit. It was the duty of Pettit to pay the debt, and there is no evidence that he did not pay it. This was a collateral issue not submitted and must be presumed to have been found by the court in support of the judgment. In the absence of opposing evidence a fact may be presumed from the proved existence of a relevant fact. It was shown that there was no administration. Rev. St. 1925, art. 3356, provides that there shall be no administration when there are no debts. It would be unreasonable to assume that the expenses incident to Mrs. Pettit's sickness and burial was anything near the value of the remaining cattle. This estimate does not take into consideration the 25 horses and mules, which the testimony shows were worth from $100 to $150 apiece, besides some hogs and household furniture, and a large amount of farming implements and machinery. The inevitable conclusion from this testimony is that after the community debts were paid, a considerable sum of money besides live stock and other personal property was left in the hands of Pettit.

It must be conceded under the facts that J. H. Pettit became the constructive trustee of the appellees' interest in all the community property remaining after the payment of community debts. Hand v. Errington (Tex. Civ. App.) 233 S. W. 567; Id. (Tex. Com. App.) 242 S. W. 722; Id. (Tex. Com. App.) 248 S. W. 25, and authorities cited.

Pettit testified that there was no change made in the operation of the ranch after the death of his wife, but that he continued to manage it and operate it afterward as he had done before. He says: That he had some lands, other than the three sections which he owned, leased and which were included in his ranch. That as his business increased, he would lease more land from time to time. That after his wife's death, he purchased the lands which are described in the deed to the Spencers, and in describing his method of business, he stated sometimes he would pay cash or part cash for the land and make notes for the balance. If he did not have

the money on hand to make the cash payment, he would borrow it from the bank, and that when the notes matured, he got the cash and "paid the notes from the proceeds of my cattle. That was my occupation." That if he did not have the ready cash, he would borrow the money and sell some stock and repay it. With reference to the payment of a certain note, he stated: "I got that $1,000 cash to pay for that land the same way that I done all of my purchases, out of the proceeds of my ranch. I got that $2,000 to make that cash payment from the proceeds of my ranch, the only way I had of getting any money. I was in the stock business and had no other business and I bought cattle and sold cattle and kept cattle on the ranch all the time and I would use the proceeds of that when I bought land to pay on it or to pay notes. I had no other income except the ranch."

The record shows that he made numerous chattel mortgages to secure loans from the bank, and he testified that he used the money so secured in buying other cattle or lands. These transactions all occurred between December 24, 1911, when he married his second wife, and the date of the sale to the Spencers. During this period he acquired 5,960.4 acres of land and at the date of the sale to the Spencers had an equity in such land approximately of the value of $150,000. The record fails to show that he acquired any property after the death of his first wife otherwise than through the transactions mentioned. The appellees lived with him during the nine years intervening between the death of his wife and the date of the sale to the Spencers and the older children assisted him on the ranch and in conducting the farm. The record shows that he had cattle to the extent of 1,500 head at one time, besides other live stock, and that out of the proceeds of the sales of the cattle and the annual increase of the cattle he paid vendor's lien notes which he had given for the various tracts of land purchased by him. The record shows that, with the exception of their interest in the original three sections of land, the appellees have never received any part of their respective interests in the other property belonging to the community estate.

It is not necessary that a party seeking to establish a constructive trust should show that any definite or aliquot part of the property sought to be impressed with the trust, was purchased with such party's funds, though the rule is otherwise respecting resulting trusts. Farmers' & Traders' Bank v. Kimball Mill Co., 1 S. D. 388, 47 N. W. 402, 36 Am. St. Rep. 739.

Appellants insist under this and other propositions, that the evidence fails to trace the trust property and its proceeds into the lands purchased by J. H. Pettit after the death of his first wife and fails to identify the specific land in which such funds were invested. We think, under the peculiar facts

of this case, appellees have sufficiently traced their interest in the common property and identified the property in which their funds have been invested. When appellees showed the amount, character, and value of the community estate as it existed at the death of their mother, that their father used the entire estate in his ranch business, selling and investing the proceeds as his own, mingling and mixing their interest with his, and further showed that he acquired no property from any other source and had no other income, and then further showed the amount, character, and value of the property sold to the Spencers and that it greatly exceeded in value the original trust property which they had inherited, their right to recover as minors was established. They had made a prima facie case. Cochran v. Sonnen (Tex. Civ. App.) 26 S. W. 521; McLaughlin v. Carter, 13 Tex. Civ. App. 694, 37 S. W. 666; Pearce v. Dyess, 45 Tex. Civ. App. 406, 101 S. W. 549; Schmidt v. Huppman, 73 Tex. 112, 11 S. W. 175; Spencer v. Pettit (Tex. Com. App.) 2 S.W.(2d) 422; 29 Cyc. 538. When and for what price each item of the trust estate was sold and what particular piece of realty or personalty was afterwards acquired with the proceeds of such sales by their father were matters known only to him. Where facts lie peculiarly within the knowledge of a party and cannot, in the nature of the case, be known to his adversary, the party having knowledge has the burden of proving such facts.

■■ "The remedy or recovery of the trust property or its substitute is necessarily dependent on proof that the property in question is the trust res or its product. The property which the cestui seeks to have equity decree to belong to him must be shown to be the original subject-matter of the trust or its successor. If the claim is made that the realty or personalty in dispute was once in the hands of the trustee, as trust property, the question of identification will not ordinarily be extremely difficult." Bogert on Trusts, 520. "If the trustee mingles trust funds with his own, the burden will be on the trustee to make a separation and to show the amount of his individual property in the mass and if the trustee cannot separate trust and private funds, the whole will be treated as trust property." (Id. 522.) Evans v. Evans, 200 Ala. 329, 76 So. 95; Atkinson v. Ward, 47 Ark. 533, 2 S. W. 77; Moore v. First National Bank of Kansas City, 154 Mo. App. 516, 135 S. W. 1005; Yellowstone County v. First Trust & Savings Bank, 46 Mont. 439, 128 P. 596; Watson v. Thompson, 12 R. I. 466; Byrom v. Gunn, 102 Ga. 565, 31 S. E. 560; Ward v. Armstrong, 84 Ill. 151; Hunt v. Smith, 58 N. J. Eq. 25, 43 A. 428; Waddell v. Waddell, 36 Utah, 435, 104 P. 743.

Pettit testified that he knew nothing about the law governing the rights of his children in the community property and never heard of community property or separate property until about the time this suit was instituted; so all presumptions with reference to what funds the trustee in the instant case used are inapplicable.

■ "Neither the number nor the character of the changes which have affected the trust property will prevent the cestui que trust from following it if he can make sufficient identification. If the trust property is money and it has been mixed with other money, the beneficiary need not identify particular coins and bills in order to establish a right to trace his property. It is sufficient that he show that his money has gone into a certain fund and remained there." Bogert on Trusts, 527.

■ "Whenever a trust fund has been wrongfully converted into another species of property, if its identity can be traced, it will be held in its new form liable to the rights of the cestui que trust. No change in its state and form can divest it of such trust. So long as it can be identified, either as the original property of the cestui que trust or as the product of it, equity will follow it and the right of reclamation attaches to it until detached by the superior equity of a bona fide purchaser for a valuable consideration without notice. The substitute for the original thing follows the nature of the thing itself so long as it can be ascertained to be such." Id. 528.

"In the following illustrative cases, the courts have held that under the specific property rule, the cestui que trust identifies the property sufficiently to enable him to follow it: Where the cestui sent money to the bankrupt to enable the latter to buy cotton for the former; and the bankrupt bought some cotton, using some of the funds for his own purposes, employing some of his own funds to buy cotton for the beneficiary and placed all the cotton in a warehouse, belonged to the cestui que trust; where an agent, to operate a store, used the proceeds of sales to buy land, taking title in his own name, the land clearly might be followed as the substitute for the trust res; where trust money was used to purchase a drug store, which was conducted by the trustee in his own name for four years, it was held that notwithstanding the shifting stock, the trust funds were sufficiently identified as being in the store." Id. 530.

■ "Where the trust res is money and the trustee invested it and his own funds in property, the cestui que trust may claim a charge thereon for his money or he may demand a proportionate interest in the property on the basis of a constructive trust." Id. 531.

The Texas cases cited above are in accord with the rules just quoted from Bogert on Trusts.

Appellees rely upon Continental National Bank v. Weems, 69 Tex. 489, 6 S. W. 802, 5 Am. St. Rep. 85; Tyler County State Bank

v. Shivers (Tex. Com. App.) 6 S.W.(2d) 108; Zundell & Co. v. Gess, 73 Tex. 144, 10 S. W. 693, and that line of decisions to sustain their contention. In our opinion, these cases are not in point and have no application. The first two were suits against insolvent banks having numerous depositors and creditors, in which actions the plaintiffs were endeavoring to secure preferences over general creditors by having the insolvent banks declared to be constructive or resulting trustees; but we have no such case before us. Appellees are not seeking a preference. There are no other creditors in this case. No third party's rights have intervened. The action is between cestuis que trustent on the one hand and a constructive trustee, who has wrongfully mingled their estate with his, and his assignees with notice, on the other. In the bank cases, specific bonds, notes, and other evidences of debt were delivered to the respective banks. In the instant case, the appellees had only an undivided interest in the entire estate, nor is this a case where a trust is sought to be established upon property held by an insolvent debtor. J. H. Pettit was not insolvent when he sold to the Spencers. Therefore the strict rule of tracing and identifying specific items of property, as insisted upon by appellants, has no application. In the Zundell Case, supra, it is held that because the banking company had, by its own fault and negligence, caused the trustee to mix and mingle the trust fund with his own, it had the burden of tracing its funds into the homestead bought by the party sought to be charged as trustee. Certainly no such rule applies to minors and in favor of their father, who was their natural guardian and a cotenant and was in a fiduciary relation to them. We think the rule which should apply to this case is announced by Judge Nickels in the well-considered case of Andrews v. Brown (Tex. Com. App.) 10 S.W.(2d) 707, from which we quote as follows:

"W. A. and S. H. Brown, having become trustees (Jan. 10, 1923) of property of N. H. Brown of undisclosed, but substantial, value, thereafter in effect mingled that property with their own (of undisclosed value) and converted the mass into a fund (net) of $57,-500. * * * That mingling of properties and sequently of funds was done without fault of N. H. Brown, or of those subsequently interested through heirship, but in wrongs by W. A. and S. H. Brown."

Citing numerous authorities, some of which we have heretofore cited, Judge Nickels says:

" 'If a man mixes trust funds with his own,' it is said, 'the whole will be treated as trust property except so far as he may be able to distinguish what is his own.' * * * That principle seems to have recognition in most, if not all, American jurisdictions.

* * * Analogous doctrines are part of the law of accession and specification * * * and of confusion of goods. * * * The principle, we apprehend, is but a part of equity's declination to extricate the wrongdoer from self-imposed hard conditions, or to tax the innocent, where one of two not in pari delicto must suffer. The principle, we think, has application here, and with a consequence that the whole of the $57,500 fund (less the $1,000 supposed to have been paid N. H. Brown, if in fact paid) must be regarded as trust property belonging to the heirs of N. H. Brown (including W. A. and S. H. Brown), in virtue of the laws of descent and distribution, in the event of 'undue influence' in procuration of the 1923 deed and nonratification under conditions noted."

Numerous other authorities are cited by Judge Jackson to the same effect in the opinion rendered in this case on the first appeal.

In their supplemental brief, appellants quote from Judge Speer's opinion in this case, reported in (Tex. Com. App.) 2 S.W.(2d) 424, as follows: There was imposed upon the plaintiffs "the duty of tracing the funds or property into the acquisition of the specific property sought to be recovered." This is unquestionably the law, but neither Judge Speer nor any other judge that we have read has held in a case against a solvent constructive trustee where no preference was sought, that any aliquot part of the cestui's mingled and undivided interest must be traced by him into any specific property purchased by the constructive trustee. Judge Speer said Pettit's "disposition of the property was wrongful," and since neither he nor his assignees will be permitted to profit by his wrong, they must do the tracing and separating or suffer the consequences. They will not be permitted to profit by Pettit's wrong. Judge Speer further stated in the next paragraph that the fact that the father had bestowed labor and care in the transaction by which the property was acquired would not in any wise affect their right to recover, and further said that the fact that J. H. Pettit was married to his second wife at the time he acquired the properties in controversy is of no importance at this point, and that if her husband's purchases were in trust for his children by the former marriage, then he never acquired any separate property interest whatever, for which reason, of course, the wife, as a member of the community, never acquired any; that the rights of the children and the duty and liability of the father in such a transaction would be precisely the same whether he had remarried or not.

The first quotation from Judge Speer's opinion set out above seems to be misunderstood by appellants. Clearly it was made having in mind the rules governing the burden of proof where the trustee wrongfully mingles trust property with his own, for he

says Pettit never acquired any separate property and that his second marriage is unimportant. In the instant case, appellees did not have to trace their property into the funds with which the lands and other cattle were purchased. It was there, mingled with Pettit's share of the estate, the instant their mother died. Moreover, it was in the trustee's hands and under his control and remained there until he transferred it, together with his own interest, to the appellants, who took with notice of appellees' rights and stand in his shoes.

We have discussed the main issues presented in this appeal, which are the same as in the former appeal, and Judge Speer said [(Tex. Com. App.) 2 S.W.(2d) 424]: "There can be no dissent from the views expressed by the Court of Civil Appeals as to the law upon the main issues discussed in that court's opinion."

The judgment of this court on the former appeal was not reversed by Judge Speer because appellees had not traced their property into Pettit's hands when it was already mingled with his share and by whom the mass was used in purchasing the property in question, but because it was insisted upon writ of error that this court had found, as a fact, that Pettit intended to continue the payment of notes given for property out of trust funds and other funds jointly as had been his practice since the death of his first wife. Judge Jackson, speaking for this court, stated that the record warranted such a conclusion, but made no such specific finding. The language there used was in discussing appellants' contention upon the first appeal that under the case of Emerson-Brantingham Implement Co. v. Brothers (Tex. Civ. App.) 194 S. W. 608, and other cases involving separate property of spouses, Pettit's intention in borrowing money for the purpose of buying cattle would affect the rights of appellees. The decision of this court upon the former appeal was not based upon Pettit's intentions, and the discussion regarding intentions was merely incidental and for the purpose of disposing of appellants' contentions. As we understand Judge Speer's opinion, the judgment of this court was reversed solely because of the supposed finding of Judge Jackson speaking for this court upon that issue.

Appellants challenge the correctness of the first special issue submitted to the jury in the last trial, because it does not allow consideration of the property purchased on credit by Pettit during his second marriage or purchased with borrowed money where he had no intention with reference to how he would meet deferred payments or where he had no intention of making the payments thereof out of joint property of himself and children of his first marriage. While it is true that the question of Pettit's

intention is not mentioned in the first issue, the court did submit the issue of his intention in the sixth special issue, and, based upon sufficient evidence, the jury found that it was his intention to make payment out of the common property of himself and appellees. If the question of Pettit's intentions is material, it was properly submitted in a separate issue.

Appellants are inconsistent in the presentation of the third and fourth propositions, wherein it is insisted that special issue No. 1 is defective because it does not permit the jury to take into consideration Pettit's intention, and in their further insistence that in this case involving the rights of parties under a constructive trust, the issue of intention is wholly immaterial. They first injected the issue into the case by their contention on the first appeal, and in their brief, filed upon this appeal, they say: "We have never heard of and challenge appellees to find any decision based on constructive trust holding that intention of trustee in making future payments for property purchased on credit is an issue." In the next breath, they say: "We think Judge Speer's announcement of the rule on the former appeal in this case is clear and specific enough to show that the title to the property purchased is fixed by the title to the property or money used in making the payment at the time the purchase is made, when he says that the purchase 'would become of the same estate as that given and intended to be given in exchange for it.' "

In discussing the question as to what effect purchases made upon credit by Pettit would have, Judge Speer said that such fact "would not necessarily disprove the plaintiffs' right to recover, nor establish the father's right to a separate interest in the lands to the extent of the credit thus extended him. The solution depends entirely upon the intention of the father in the transactions."

Proceeding upon the mistaken idea that this court had found, as a fact, what the intentions of Pettit were with reference to future purchases and holding that this court had no authority to make such a finding and predicate its judgment upon it, Judge Speer reversed our former decision. Even if we had made such finding, it would have been immaterial. We did not think, when the case was here before, that the solution of the question before us depended upon the intention of Pettit, and we do not think so now.

When Judge Speer said—"The solution depends entirely upon the intention of the father in the transactions," if he meant to hold that Pettit's intentions could control or in the slightest degree affect the right of appellees, then we respectfully decline to follow his holding.

In the last case of Texas Creosoting Co. v. Hartburg Lumber Co. (Tex. Com. App.) 12 S.W.(2d) 169, 173, Judge Short said: "A constructive trust is one which arises purely by construction of equity and is entirely independent of any actual or presumed intention of the parties. It is one which arises entirely by operation of law without reference to any actual or supposed intention of creating a trust, and is often, directly contrary to such intention. It is one entirely in invitum, and is forced upon the conscience of the trustee for the purpose of working out right and justice and frustrating fraud."

Judge Short again said, in Lipsitz v. First National Bank (Tex. Com. App.) 293 S. W. 563: " 'Constructive trusts' are those which arise purely by construction of equity, and are entirely independent of any actual or presumed intention of parties."

Bogert on Trusts, 116 says: "Constructive trusts do not arise because of the intent of the parties that they shall arise, but often directly contrary to such intent. They are not intent-enforcing trusts, but in a general way may be called fraud-rectifying trusts."

In 3 Pom. Eq. Jur. (4th Ed.) § 1044, it is stated: "Constructive trusts include all those interests in which a trust is raised by the doctrines of equity for the purpose of working out justice in the most efficient manner where there is no intention of the parties to create such a relation and in most cases contrary to the intention of the one holding the legal title and where there is no express or implied, written or verbal declaration of trust. They arise when the legal title to property is obtained by a person in violation, express or implied, of some duty owed to the one who is equitably entitled and when the property thus obtained is held in hostility to his beneficiary's rights or ownership. As trusts of this class are imposed by equity, contrary to the trustee's intention and will, upon property in his hands, they are often termed trusts in invitum."

Every text-writer upon this question available to us holds that in cases based upon constructive trusts, the intentions of neither party are important. 26 R. C. L. 1232, § 78, page 1235, § 82; Simkins on Equity, 152; 1 Perry on Trusts (6th Ed.) § 166; 2 Story's Equity (13th Ed.) § 1254; 39 Cyc. 27; 3 Bouv. Law Dict. 3329. To the same general effect are the following Texas cases: Olcott v. Gabert, 86 Tex. 121, 23 S. W. 985; Henyan v. Trevino (Tex. Civ. App.) 137 S. W. 458; Yarborough v. Tolbert (Tex. Civ. App.) 282 S. W. 302; Oaks v. West (Tex. Civ. App.) 64 S. W. 1033; Hendrix v. Nunn, 46 Tex. 147; Van Orden v. Pitts (Tex. Com. App.) 206 S. W. 830.

What we have said heretofore disposes of all the appellants' propositions, except the fifteenth, and they are overruled.

 Under the fifteenth proposition, complaint is made of the argument of one of appellees' attorneys as being inflammatory and prejudicial. No exception was taken at the time of the argument, and the bill was presented to the trial judge and filed with the clerk more than a month after the adjournment of court. Without setting out the argument in full, suffice it to say that it is not subject to the criticisms urged and would not constitute reversible error, even if appellants had excepted to it at the time the argument was made. The objectionable part of the argument by Mr. Vickers is prefaced with this statement: "They talk a great deal about this affidavit and they talk about Roscoe Wilson." This indicates that what was subsequently stated was retaliatory, and the bill of exception, failing to show that the argument objected to was not provoked by and in reply to the argument of opposing counsel, is insufficient to show prejudice.

The bill of exception is not prepared in accordance with either article 1838 or article 2237 of the Revised Civil Statutes 1925. In qualifying the bill, the trial judge does not say that the remarks alleged to have been made by Mr. Vickers were correctly set out in the bill, and the only evidence of that fact is a certificate by the court reporter. Even if the remarks could be held to be inflammatory and prejudicial, and even if the bill showed that they were not retaliatory, we incline to the opinion that the point is not so presented as to require consideration. We have, however, considered it and overrule the proposition.

For the reasons stated, the judgment is affirmed.